## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| OBG TECHNICAL SERVICES, INC., | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | 3:06cv1850 (MRK) |
| | : | |
| NORTHROP GRUMMAN SPACE & | : | |
| MISSION SYSTEMS CORP., as | : | |
| successor in interest to TRW, Inc., and | : | |
| BEST FRIENDS, INC., | : | |
| | : | |
| Defendants. | : | |

## <u>MEMORANDUM OF DECISION</u>

This case involves land (the "Plainville Site") that Defendant Northrop Grumman Space & Mission Systems Corp. ("Northrop Grumman") owned until it divided the site into three parcels and sold one parcel to Defendant Best Friends, Inc. ("Best Friends") in 1988 and the remaining parcels to Plaintiff OBG Technical Services, Inc. ("OBG") in 1990. The Plainville Site had been used for many decades for various industrial purposes, and those operations resulted in contamination of the soil and groundwater as well as a lagoon located on the site. In this action, OBG sues Northrop Grumman and Best Friends in an eleven-count complaint, alleging that the Defendants failed to disclose the true extent of pollution on their properties and failed to prevent pollution on Best Friends' parcel from migrating onto OBG's parcel. OBG also asserts various contract-based claims related to the agreement between OBG and Northrop Grumman by which OBG acquired its portion of the Plainville Site.

OBG is an environmental consulting firm and was Northrop Grumman's environmental consultant regarding remediation of contamination on the Plainville Site. OBG acquired the parcels

at issue in this case after preparing a site investigation report that state officials used to approve a remediation plan for the site. In return for assuming responsibility for the required remediation work on the site, OBG received both the parcels and a payment of approximately $10.5 million from Northrop Grumman "[i]n recognition of the inherent potential liabilities associated with the [site]." Purchase Agreement, Art. VI., Second Am. Compl. [doc. # 43] Ex. A ("Purchase Agreement"). OBG hoped to clean up the site and sell it for a nice profit. However, the contamination on the site proved to be more extensive than OBG thought, the clean-up took longer, and the State later imposed new environmental regulations that will require further clean-up, and more expense, if OBG wants to sell its property. As a consequence, while OBG thought it had made a good deal when it acquired the property, with the benefit of hindsight, it turns out it was not. In this case, however, the hindsight is from a rather distant point in time, for OBG acquired the parcel from Northrop Grumman in 1991, about fifteen years before OBG filed this action in November 2006. As discussed below, it is simply far too late in the day for OBG to pursue its second thoughts.

After OBG filed its complaint, Defendants moved to dismiss it, raising a number of statute of limitations issues. After OBG amended its complaint in an effort to address the motions to dismiss, Defendants Northrop Grumman and Best Friends renewed their motions to dismiss. In addition, Northrop Grumman moved, in the alternative, for summary judgment as to all of OBG's claims alleged against Northrop Grumman. For the reasons discussed below, the Court GRANTS Northrop Grumman's and Best Friends' Motions to Dismiss [docs. ## 50, 52] and DENIES WITHOUT PREJUDICE Northrop Grumman's Motion for Summary Judgment [doc. # 53].

# I.

The Court will briefly recite the facts here and discuss them in greater detail as it evaluates each of OBG's claims. In summarizing the facts, the Court "accept[s] as true all factual statements alleged in the complaint and draw[s] all reasonable inferences in favor of" OBG. *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007); *see Desiano v. Warner-Lambert Co.*, 326 F.3d 339, 347 (2d Cir. 2003). On a Rule 12(b) motion, "[a] complaint is deemed to include any written instrument attached to it as an exhibit, materials incorporated in it by reference, and documents that, although not incorporated by reference, are integral to the complaint." *Sira v. Morton*, 380 F.3d 57, 67 (2d Cir. 2004) (internal citations and quotation marks omitted); *see also Collier v. Aksys Ltd.*, No. 3:04CV1232(MRK), 2005 WL 1949868, at *1 (D. Conn. Aug. 15, 2005), *aff'd*, 179 Fed. Appx. 770 (2d Cir. 2006). A document is integral to the complaint "where the complaint relies heavily upon its terms and effect." *Mangiafico v. Blumenthal*, 471 F.3d 391, 398 (2d Cir. 2006). As the Second Circuit stated in *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002), "a plaintiff's *reliance* on the terms and effect of a document in drafting the complaint is a necessary prerequisite to the court's consideration of the document on a dismissal motion; mere notice or possession is not enough." Thus, in its description of the facts and analysis of OBG's complaint, the Court relies not only on OBG's Second Amended Complaint [doc. # 43], but also on the 1991 Purchase Agreement between OBG and Northrop Grumman, which OBG attached to the complaint, *see* Second Am. Compl. [doc. # 43] Ex. A ("Purchase Agreement"), and the Consent Order Plan that is referred to in the complaint, *see id.* ¶¶ 28, 30, 35, 41, 83. Although OBG did not attach the Consent Order Plan to the complaint, the Court finds that it may consider the Consent Order Plan because: (1) the Consent Order Plan is "integral" to the complaint; (2) "no dispute exists

3

regarding the authenticity or accuracy" of the Consent Order Plan; and (3) "no material disputed

issues of fact [exist] regarding the relevance" of the Consent Order Plan. *Faulkner v. Beer*, 463 F.3d

130, 134 (2d Cir. 2006).

As noted previously, this case involves the Plainville Site, which OBG acquired from

Northrop Grumman on December 20, 1990. Four years earlier, in 1986, Northrop Grumman had

retained OBG[1] as an environmental clean-up contractor to conduct "environmental remediation of

the [Plainville Site]," Second Am. Compl. [doc. # 43] ¶ 17, and in particular, to remove underground

storage tanks on the site and to analyze soil samples from around the tanks to determine the extent

to which oil and grease from the tanks had contaminated the surrounding soil. At or around this

time, Northrop Grumman also subdivided the Plainville Site into parcels A, B, and C. Relevant to

this litigation, the underground storage tanks that OBG removed for Northrop Grumman were

located on parcel A, while a lagoon contaminated with industrial waste products was located on

parcel B; parcels B and C are located on a downward gradient from parcel A.

In July 1988, Best Friends acquired parcel A.[2] Apparently at or around the time that Best

Friends acquired parcel A, Northrop Grumman entered into negotiations with the Connecticut

Department of Environmental Protection ("DEP") regarding remediation of contamination on the

---

[1] OBG was actually hired by TRW, Inc. Northrop Grumman became the successor to TRW, Inc. in or around 2002 but to limit any confusion, the Court will simply refer to TRW, Inc. as Northrop Grumman.

[2] It is unclear precisely how Best Friends acquired parcel A. The Second Amended Complaint alleges that Best Friends acquired parcel A from Northrop Grumman, *see* Second Am. Compl. [doc. # 43] ¶ 20, but Best Friends asserts in its brief that it received title from another company that had purchased parcel A from Northrop Grumman. *See* Memorandum in Support of Best Friends' Motion to Dismiss [doc. # 35-2] at 2 n.2. Precisely how Best Friends acquired parcel A, however, is immaterial to the Court's analysis.

Plainville Site. Northrop Grumman and the DEP discussed a remediation plan (eventually titled the "Consent Order Plan"), under which Northrop Grumman would be responsible for removing contaminants from the Plainville Site. As part of its negotiations with the DEP, Northrop Grumman hired OBG to "conduct[] investigations at the [Plainville Site]," Second Am. Compl. [doc. # 43] ¶ 23, and prepare a Site Investigation Report that would be presented to the DEP on behalf of Northrop Grumman. OBG's Site Investigation Report described "the extent and degree of soil and ground water pollution resulting from the waste waters discharged on-site, the leaking fuel oil storage tanks and the disposal of . . . solid waste on the [Plainville Site]." Northrop Grumman's Motion to Dismiss [doc. # 52], Aff. of Thomas Hogan, Ex. 6 ("Consent Order Plan") ¶ 7. OBG submitted its Site Investigation Report to the DEP in 1989, and the Report was later approved by the DEP as part of the Consent Order Plan for the Plainville Site. *See id*.

Following submission of the Site Investigation Report to the DEP, OBG and Northrop Grumman began to discuss OBG's acquisition of parcels B and C. On December 20, 1990, OBG and Northrop Grumman entered into a Purchase Agreement to transfer parcels B and C to OBG (the "Property"). *See* Purchase Agreement. Under the terms of the Purchase Agreement, OBG agreed to take full responsibility for all remediation work required of Northrop Grumman by the DEP in connection with its approval of the Consent Order Plan. In return, OBG would receive title to the Property in addition to cash payments from Northrop Grumman totaling approximately $10.5 million. The payments were stated in the Purchase Agreement to be "[i]n recognition of the *inherent potential liabilities associated with the Site* which will be assumed by Purchaser upon passage of title to Purchaser, and Purchaser's agreements to perform the Work as well as develop the Site for sale or other disposition." Purchase Agreement, Art. VI (emphasis added). Notably, the Purchase

Agreement contained no representations or warranties by Northrop Grumman regarding environmental conditions on the Plainville Site.

At the time OBG and Northrop Grumman executed the Purchase Agreement, Northrop Grumman, OBG, and the DEP had nearly (but not yet) finalized the Consent Order Plan stating precisely what remediation efforts would be required on the Plainville Site. Thus, the Purchase Agreement stated that OBG "shall acquire and take title to [the Property] within thirty days, or as soon as practicable thereafter, following DEP's approval of a Consent Order Plan acceptable to [Northrop Grumman] and to [OBG] . . . ." Purchase Agreement, Art. I. OBG and Northrop Grumman knew that a portion of the Consent Order Plan would contain a threshold for total petroleum hydocarbons ("TPH")–measured in parts per million ("ppm")– that could be left in the soil following remediation efforts on the site. The parties anticipated that this "threshold treatment standard" in the Consent Order Plan would be 20,000 ppm. However, the Purchase Agreement included an explicit provision stating that if the threshold in the Consent Order Plan that the DEP ultimately approved was lower than 20,000 ppm (thus, more stringent), both OBG's and Northrop Grumman's obligations under the Purchase Agreement, including any cash payments by Northrop Grumman, would be suspended "pending resolution of the amount of additional time or compensation for the performance of the Consent Order Plan as set forth below in this Article and in Article X." *See* Purchase Agreement, Art. VI(b). In the event that the TPH threshold was set below 20,000 ppm, the Purchase Agreement included caps on how much more Northrop Grumman would pay OBG to complete remediation on the site. *See id.*, Art. VI(c). However, the Purchase Agreement did not mandate any particular level of compensation in the event of a revised TPH threshold. Instead, the Purchase Agreement required the parties mutually to agree on any

modifications to the payment terms, and allowed either party unilaterally to terminate the Purchase Agreement if the parties were unable to agree upon new payment terms "within thirty days of the date of the DEP's approval of the Consent Order Plan."  Purchase Agreement, Art. X(b).

The parties also anticipated that after OBG completed the remediation work required under the Consent Order Plan, the DEP would require continued "monitoring and maintenance work" on the Property, which the parties referred to in the Purchase Agreement as "O&M Work."  Under the Purchase Agreement, OBG was required to perform all O&M Work "including, without limitation, investigation, operation of systems, analyses, maintenance, and reporting for as long as DEP requires such O&M Work."  Purchase Agreement, Art. III.  Finally, the Purchase Agreement included an indemnity provision, which provided, in pertinent part, as follows:

> Except . . . in connection with the performance of any Work required on Best Friends Property under the Consent Order Plan or any required O&M Work, [OBG] shall have no responsibility for environmental conditions outside the physical boundaries of the Site . . . (such environmental conditions and claims collectively hereunder called "Off-Site Claims").  Purchaser shall have responsibility for Off-Site Claims where and to the extent any such claims are caused by Purchaser's negligence, errors, omissions (including without limitation, negligence, errors or omissions in implementing Consent Order Plan Work or O&M Work), or failure to comply with the Consent Order Plan (which conditions or claims based on Purchaser's negligence, errors or omissions or failure to comply are collectively referred to as "Excluded Off-Site Claims").
>
> [Northrop Grumman] shall indemnify and save harmless [OBG] from and against any and all loss and expense arising out of [such] Off-Site Claims, except for Excluded Off-Site Claims.

Purchase Agreement, Art. V.

The DEP, Northrop Grumman, and OBG finalized the Consent Order Plan on or around March 20, 1991.  As the parties anticipated, the Consent Order Plan included a TPH threshold of 20,000 ppm.  Thereafter, Northrop Grumman transferred title to the Property to OBG on October 15,

1991.  Based on the requirements of the Consent Order Plan, OBG anticipated completing the required remediation of the Property within five years and intended then to develop and sell the Property.

In order to perform its obligations under the Consent Order Plan, OBG installed a Product Recovery System consisting of multiple pumps and wells installed around the perimeter of the contaminated lagoon on OBG's Property;  OBG also installed two pumps and wells on Best Friends' property located where OBG had previously removed the underground storage tanks.  OBG was responsible for maintaining and monitoring the pumps and wells both on its Property and on Best Friends' property.  The pumps functioned to remove free-floating oil and grease particles ("free product") into monitoring and recovery wells, from which the free product would be removed and stored for off-site disposal.  In or around 1994, OBG completed remediation of the contaminated lagoon through the Product Recovery System, and confirmed completion in a Site Certification Report, which was later approved by the DEP in August 1994.  According to OBG, as a result of completion of the lagoon remediation, "OBG satisfied its contractual obligations for remediation of the Property as provided in the Purchase Agreement in accordance with [the] DEP standards then applicable."  Second Am. Compl. [doc. # 43] ¶ 43.  However, OBG apparently continued operating its Product Recovery System even after approval of its Site Certification Report; it is not entirely clear from the Second Amended Complaint why OBG chose to do so.

In 1995, approximately four years after DEP approval of the Consent Order Plan and after OBG had certified to the DEP that it had satisfied its contractual obligations for remediation under the Purchase Agreement, the DEP adopted new Remediation Standard Regulations (the "1995 Regulations").  The 1995 Regulations apply not only to the Plainville Site but to other remediation

sites located around Connecticut. In pertinent part, the 1995 Regulations drastically reduced the acceptable threshold levels of TPH to between 500 to 1,000 ppm, as compared to the Consent Order Plan standard of 20,000 ppm. Significantly, though, conformance with the new TPH threshold was required only if the affected property owner attempted to sell or otherwise transfer its property. However, since OBG anticipated selling its Property for development purposes, OBG perceived the 1995 Regulations as dramatically reducing the value of its Property.

In 1997, the DEP adopted a second regulatory change that required OBG to install an Iron Treatment System to reduce discharge of the iron collected from the Product Recovery System (the "1997 Regulations"). It is not clear from the facts alleged in the complaint whether the 1997 Regulations applied only to the Plainville Site or to other properties as well, though it would appear that the 1997 Regulations, like the 1995 Regulations, were of general application. OBG alleges that both it and Northrop Grumman had been aware of iron contamination on the Property prior to the transfer to OBG but that they had taken no action with respect to the iron contamination because neither the Consent Order Plan nor earlier DEP standards had required any iron remediation on the site. OBG asserts that at substantial expense, it constructed and implemented an Iron Treatment System on the site from June 1998 to April 1999.

In or around November 2004, OBG shut down its Product Recovery System in consultation with the DEP. Thus, the Product Recovery System no longer actively pumps free product into the monitoring and recovery wells on the Plainville Site; however, the monitoring and recovery wells continued to passively collect free product. According to OBG, since November 2004, all of the monitoring and recovery wells have passively recovered only a *de minimis* amount of free product, except for one well located on Best Friends' property that continues to recover a significant amount

of free product. OBG asserts that these data from the monitoring and recovery wells, which OBG claims were not available until the Product Recovery System was shut down in 2004, demonstrates that the free product contamination originated from Best Friends' property. In its Second Amended Complaint, OBG states that as of June 2006, it had removed 31,377 gallons of free-floating product from the Product Recovery System. OBG also asserts that the "volume of free-floating product recovered as of June 2006 far exceeded the expected recovery amounts at the time the Purchase Agreement was executed." Second Am. Compl. [doc. # 43] ¶ 39.

According to OBG, Northrop Grumman defrauded OBG by not disclosing to OBG the full extent of the contamination on the Plainville Site and the fact that the contamination was migrating, or would migrate, from Best Friends' parcel onto OBG's Property. OBG also brings tort claims against Best Friends related to the migration of free product from Best Friends' property onto OBG's Property. Finally, OBG asserts contract-based claims against Northrop Grumman, alleging that under the Purchase Agreement Northrop Grumman was obligated to indemnify OBG for costs related to the migration of contaminants onto its Property, and that adoption of the 1995 and 1997 Regulations required Northrop Grumman to renegotiate the terms of the Purchase Agreement. OBG says that it contacted Northrop Grumman in 2000 in an attempt to renegotiate the Purchase Agreement. OBG further alleges that Northrop Grumman repeatedly represented that it would be amenable to renegotiating the Purchase Agreement until sometime in 2005, when Northrop Grumman definitively stated it would not renegotiate the Purchase Agreement nor would it indemnify OBG. This lawsuit followed in November 2006.

## II.

The Supreme Court's recent decision in *Bell Atlantic Corp. v. Twombly*, ___ U.S. ___, 127 S. Ct. 1955 (2007), has raised "[c]onsiderable uncertainty concerning the standard for assessing the adequacy of pleadings," *Iqbal v. Hasty*, 490 F.3d 143, 155 (2d Cir. 2007), on a motion to dismiss under Rule 12(b)(6) of the *Federal Rules of Civil Procedure*. However, the Second Circuit has instructed that the Supreme Court in *Twombly* did not intend to require a "universal standard of heightened fact pleading," but instead "requir[es] a flexible 'plausibility standard,' which obligates a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render a claim *plausible*." *Id.* at 157-58. Nevertheless, even after *Twombly*, the issue on a motion to dismiss "is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to support the claims." *Desiano v. Warner-Lambert Co.*, 326 F.3d 339, 347 (2d Cir. 2003); *see Erickson v. Pardus*, ___ U.S. ___, 127 S. Ct. 2197, 2200 (2007); *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 506 (2002).

Before turning to the merits, the Court notes three preliminary issues. First, the procedural history demonstrates that OBG has had ample opportunity to amend its complaint to address the concerns raised in the motions to dismiss. OBG filed its initial Complaint [doc. # 1] on November 15, 2006, followed by an Amended Complaint [doc. # 20] in January 2007. Northrop Grumman and Best Friends then filed detailed Motions to Dismiss the Amended Complaint [docs. ## 34, 35], which the Court denied without prejudice, *see* Order [doc. # 39], at OBG's request in order to allow OBG to address the motions by way of a second amended complaint. OBG filed its Second Amended Complaint [doc. # 43] in March 2007. Northrop Grumman and Best Friends then renewed their motions to dismiss [docs. ## 50, 52], and Northrop Grumman additionally filed an "in the

alternative" Motion for Summary Judgment [doc. # 53]. At oral argument, OBG's counsel represented to the Court that he had pled facts in the Second Amended Complaint to the fullest extent possible consistent with his obligations under Rule 11 of the *Federal Rules of Civil Procedure*. Accordingly, OBG's counsel did not seek any further opportunities to amend OBG's complaint in response to the defects Defendants have identified in OBG's claims or in response to the Court's decision on the motions to dismiss.

Second, in their renewed motions to dismiss, Defendants rely primarily on their assertion that OBG's claims fall beyond the relevant statutes of limitations. A statute of limitations defense is most often pleaded as an affirmative defense and requires a factual inquiry beyond the face of the complaint. However, a defendant may raise the statute of limitations in a Rule 12(b)(6) motion "[w]here the dates in a complaint show that an action is barred by a statute of limitations . . . ." *Ghartey v. St. John's Queens Hosp.*, 869 F.2d 160, 162 (2d Cir. 1989), *cited favorably in McKenna v. Wright*, 386 F.3d 432, 436 (2d Cir. 2004); *see McCarty v. Derivium Capital, LLC*, No. Civ. 303CV651MRK, 2006 WL 413258, at *2 (D. Conn. Feb. 21, 2006).

Third, and finally, in addition to its motion to dismiss, Northrop Grumman filed a Motion for Summary Judgment [doc. # 53] "in the alternative" [doc. # 52], and Northrop Grumman submitted a number of DEP and other documents designed to show that OBG's claims are time-barred. The Court elects not to convert Northrop Grumman's motion to dismiss into a motion for summary judgment. *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 154 (2d Cir. 2002) (stating that a court has two options: exclude extrinsic documents or convert the motion to one for summary judgment). The Court does so because the Court is able to dismiss OBG's claims on the basis of Northrop Grumman's motion to dismiss. Since the Court will not convert the motion to dismiss into

a motion for summary judgment, the Court will restrict itself, as previously noted, to the Second Amended Complaint and the documents attached to it or incorporated by reference in it.

OBG's Second Amended Complaint [doc. # 43] asserts eleven counts against Northrop Grumman and Best Friends. Because Defendants raise similar arguments in response to many of the counts, the Court has grouped OBG's claims into three broad categories: tort claims, contract claims, and statutory claims. The Court will discuss those claims in the following order: those claims asserted against Northrop Grumman only; those claims brought against both Northrop Grumman and Best Friends; and finally, the claims asserted against Best Friends only.

## III.    CLAIMS AGAINST NORTHROP GRUMMAN

### A.    TORT CLAIMS

OBG brings several tort claims against Northrop Grumman. These include Fraud (Count I), Breach of Implied Covenant of Good Faith and Fair Dealing (Count III),[3] Negligent Misrepresentation (Count V), Innocent Misrepresentation (Count VI), and Unilateral Mistake (Count

---

[3] As OBG notes in its brief, Connecticut courts have disagreed on whether a cause of action for breach of an implied covenant of good faith and fair dealing is a tort- or contract-based claim for purposes of the statute of limitations. *See* Pl's Mem. in Opp. to Northrop Grumman's Mot. to Dismiss [doc. # 59] at 4 n.2. *Compare Cent. Sports, Inc. v. Yamaha Motor Corp., U.S.A.*, 477 F. Supp. 2d 503, 511 (D. Conn. 2007) ("Under Connecticut law, every contract contains an implied covenant of good faith and fair dealing, violation of which is actionable in tort."), *and Citizens Commc'ns Co. v. Trustmark Ins.*, 303 F. Supp. 2d 197, 207-08 (D. Conn. 2004) ("Connecticut courts have explicitly stated that the breach of the covenant of good faith and fair dealing creates a distinct tort cause of action."), *with People's Bank v. Arm Enters., Inc.*, Nos. 285171, 294102, 1996 WL 499176, at *3 (Conn. Super. Ct. Aug. 27, 1996) ("[A]n action for breach of an implied covenant of good faith and fair dealing is an action on a contract and not an action in tort."). The Court need not, and therefore does not, decide this issue since in this case it does not matter whether the Court applies a tort or contract limitations period to OBG's good faith and fair dealing claim; in either case, it is time-barred absent the tolling of the applicable statute of limitations. For purposes of convenience only, the Court will discuss OBG's claim for breach of the implied covenant of good faith and fair dealing claim in the context of OBG's tort claims. *See* Pl.'s Mem. in Opp. to Northrop Grumman's Mot. to Dismiss [doc. # 59] at 4-13.

VII).[4]  OBG alleges that Northrop Grumman knew of the scope of the pollution on Best Friends' property because Northrop Grumman had previously owned that site, and also knew (OBG does not explain how or why) that the pollution on Best Friend' site was migrating or would likely migrate onto OBG's Property.  OBG alleges that Northrop Grumman had a duty to disclose this information to OBG and that Northrop Grumman intentionally or negligently failed to do so.  Importantly, OBG does not allege that Northrop Grumman made any affirmative misrepresentations regarding the extent of pollution on Best Friends' property or that Northrop Grumman took any affirmative steps to prevent OBG from discovering its cause of action.

Generally, under Connecticut state law, "[n]o action founded upon a tort shall be brought but within three years from the date of the act or omission complained of."  Conn. Gen. Stat. § 52-577. However, for claims alleging negligence, including negligent misrepresentation, the applicable statute of limitations is two years.  *See* Conn. Gen. Stat. § 52-584.  According to the Second Amended Complaint, Northrop Grumman's allegedly tortious conduct occurred in connection with negotiation of the Purchase Agreement, between October 1989 and December 20, 1990.  *See* Second Am. Compl. [doc. # 43] ¶ 67.  The Court need not determine precisely when the alleged torts occurred since OBG acknowledges that, unless the statutes of limitations on its tort claims are tolled, its tort claims are barred by Connecticut's statutes of limitations.  OBG asserts that the statutes of

_____

[4] OBG's count for "unilateral mistake" sounds in tort, rather than contract, because OBG seeks damages and not reformation or recission of the contract and the claim is founded on allegations of misrepresentations by Northrop Grumman.  In their briefs, the parties have treated the unilateral mistake claim as a tort claim.  *See* Second Am. Compl. [doc. # 43] ¶¶ 116-21; Mem. in Supp. of Northrop Grumman's Mot. to Dismiss [doc. # 52] at 4-5;  Pl.'s Mem. in Opp'n to Northrop Grumman's Mot. to Dismiss [doc. # 59] at 31-32.

limitations for its tort claims should be tolled under the doctrines of fraudulent concealment and continuing course of conduct.

Before discussing OBG's arguments, the Court notes that because OBG's claims are time-barred on the face of its own complaint, OBG has the burden of pleading facts sufficient to establish that the statutes of limitations should be tolled. *See Iqbal*, 490 F.3d at 157-58 (explaining that *Twombly* requires a "pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim *plausible*."); *In re Publ'n Paper Antitrust Litig.*, No. 304MD1631SRU, 2005 WL 2175139, at *3 (D. Conn. 2005) (placing burden on plaintiff to plead facts sufficient to trigger tolling of statute of limitations); *Long v. Abbott Mortgage Corp.*, 459 F. Supp. 108, 113 (D. Conn. 1978) (Newman, J.) (same). Moreover, to the extent OBG seeks to toll the statutes of limitations under the doctrine of fraudulent concealment, OBG must "allege with particularity the circumstances" surrounding the alleged fraudulent concealment in accordance with the heightened pleading requirements for fraud that are specified in Rule 9(b) of the *Federal Rule of Civil Procedure* 9(b). *In re Publ'n Paper*, 2005 WL 2175139, at *5; *see also Aetna Cas. & Sur. Co. v. Aniero Concrete Co., Inc.*, 404 F.3d 566, 582 (2d Cir. 2005) (A claim of fraudulent concealment, "like that for fraudulent inducement, must pass muster under Rule 9(b).").

### 1. Fraudulent Concealment

OBG alleges that Northrop Grumman fraudulently concealed the underlying tort violations from OBG and that those violations were not discoverable until November 2004, when OBG shut off the Product Recovery System and for the first time learned that the free-floating product that it was continuing to remove from its pumps and wells was migrating from Best Friends' property. Section 52-595 of the Connecticut General Statutes provides as follows:

> If any person, liable to an action by another, fraudulently conceals from him the existence of the cause of such action, such cause of action shall be deemed to accrue against such person so liable therefor at the time when the person entitled to sue thereon first discovers its existence.

Conn. Gen. Stat. § 52-595. In construing this statute, the Connecticut Supreme Court has explained that

> to prove fraudulent concealment, [plaintiffs are] required to show that [defendants]: (1) had actual awareness, rather than imputed knowledge, of the facts necessary to establish the plaintiffs' cause of action; (2) intentionally concealed these facts from the plaintiffs; and (3) concealed the facts for the purpose of obtaining delay on the plaintiffs' part in filing a complaint on their cause of action.

*Falls Church Group, Ltd. v. Tyler, Cooper & Alcorn, LLP*, 281 Conn. 84, 105 (2007).

As noted above, OBG does not allege that Northrop Grumman took any affirmative steps to intentionally conceal facts necessary to establish OBG's causes of action against Northrop Grumman. However, in *Falls Church Group*, the Connecticut Supreme Court observed that "[t]his court 'has not yet decided whether affirmative acts of concealment are always necessary to satisfy the requirements of § 52-595.'" 281 Conn. at 107 (quoting *Connell v. Colwell*, 214 Conn. 242, 250 n.6 (1990)). For example, the court noted, "although fraudulent concealment generally requires an affirmative act of concealment, nondisclosure is sufficient *when the defendant has a fiduciary duty to disclose material facts*." *Id.* at 107 (emphasis added) (quotation mark omitted). The fiduciary duty exception noted in *Falls Church Group* does not apply in this case, since OBG readily admits that "[Northrop Grumman] did not owe a fiduciary duty to OBG . . . ." Pl.'s Mem. in Opp'n to Northrop Grumman's Mot. to Dismiss [doc. # 59] at 23-24.[5]

_____

[5] OBG cites multiple decisions in its opposition brief in support of an argument that despite a lack of fiduciary duty, Northrop Grumman still had a duty to disclose material facts to OBG and that Northrop Grumman's breach of that duty is sufficient to establish fraudulent concealment. *See* Pl.'s Mem. in Opp'n to Northrop Grumman's Mot. to Dismiss [doc. # 59] at 10-13 (relying primarily

Nevertheless, OBG seeks instead to invoke what it asserts is another exception to the general requirement that a party relying on the doctrine of fraudulent concealment plead and prove an affirmative act of concealment. Citing federal cases, OBG contends that a plaintiff may prove fraudulent concealment without showing affirmative acts of concealment when the defendant's tortious conduct is "self-concealing." *See, e.g.*, *New York v. Hendrickson Bros., Inc.*, 840 F.2d 1065, 1083-84 (2d Cir. 1988); *In re Publ'n Paper*, 2005 WL 2175139, at *3.

Before discussing the concept of a self-concealing violation and the role it plays in the doctrine of fraudulent concealment, the Court must pause to note that no Connecticut appellate decision has ever expressly embraced the concept of a self-concealing violation. However, in *Fichera v. Mine Hill Corp.*, 207 Conn. 204 (1988), the Connecticut Supreme Court referred to the concept of a self-concealing violation, *see id.* at 215 n.5, and cited to the United States Supreme Court's decision in *Bailey v. Glover*, 88 U.S. (21 Wall.) 342 (1874) in the course of discussing how affirmative acts of concealment may not always be required to prove fraudulent concealment. *See*

---

on *Wedig v. Brinster*, 1 Conn. App. 123 (1983)). OBG's argument is not supported by relevant case law. The obligation of those with a fiduciary duty is heightened for good reason. As the Connecticut Supreme Court has explained, "[t]he law will imply [fiduciary responsibilities] only where one party to a relationship is unable to fully protect its interests [or where one party has a high degree of control over the property or subject matter of another] and the unprotected party has placed its trust and confidence in the other." *Hi-Ho Tower, Inc. v. Com-Tronics, Inc.*, 255 Conn. 20, 42 (2000) (alteration in original). Therefore, while those possessing a fiduciary duty may have a continuing obligation to inform another party of the existence of a cause of action, that duty should not extend more broadly, especially where, as here, two commercial entities are parties to an arm's-length business transaction. That is why none of the cases cited by OBG discusses a non-fiduciary duty to disclose in the context of either tolling a statute of limitations or the doctrine of fraudulent concealment. The Court has found no Connecticut case involving a claim of fraudulent concealment that has imposed a duty to disclose the existence of a cause of action on non-fiduciary commercial parties in the context of an arm's-length business deal. Moreover, the Connecticut Supreme Court, in *Falls Church Group*, expressly stated that the exception to the requirement for affirmative acts of concealment applied *only* when a defendant had a fiduciary duty to disclose material facts. 281 Conn. at 107-08.

*Fichera*, 207 Conn. at 215. *Bailey* is the foundational decision for federal common law regarding fraudulent concealment and is generally considered the originator of the concept of a self-concealing violation. Therefore, for purposes of this decision, the Court will assume (though without deciding) that in applying the fraudulent concealment doctrine, Connecticut courts would not require proof of an affirmative act of concealment where the fraudulent violation itself was self-concealing as that phrase is generally understood under federal common law.

In *Bailey*, the Supreme Court explained that "when the fraud has been concealed, or is of such character as to *conceal itself*, the statute [of limitations] does not begin to run until the fraud is discovered by, or becomes known to, the party suing . . . ." *Bailey,* 88 U.S. at 349-50 (emphasis added). Describing the nature of a self-concealing fraud in greater detail, the Supreme Court explained that

> where the party injured by the fraud remains in ignorance of it *without any fault or want of diligence or care on his part*, the bar of the statute does not begin to run until the fraud is discovered, though there be no special circumstances or efforts on the part of the party committing the fraud to conceal it from the knowledge of the other party.

*Id.* at 348 (emphasis added); *see Holmberg v. Armbrecht*, 327 U.S. 392, 397 (1946); *Abbott Mortgage*, 459 F. Supp. at 113 ("The statute only begins to run 'when the plaintiff either acquires actual knowledge of the facts that comprise his cause of action or should have acquired such knowledge through the exercise of reasonable diligence after being apprised of sufficient facts to put him on notice.'") (quoting *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 461 (2d Cir. 1974)). Judge Jon O. Newman has explained that the phrase "self-concealing" encompasses "an enterprise where the particular fraud is, by its nature, unknowable. A fraud conceals itself when a plaintiff,

even by the exercise of due diligence, could not uncover it. . . . In other words, the very essence of the fraud practice itself prevents discovery." *Abbott Mortgage*, 459 F. Supp. at 120.

The role of self-concealing violations in the doctrine of fraudulent concealment has received considerable criticism in commentary and judicial decisions because of the loose language that some courts use when applying the concept and also because the phrase "self-concealing" is often invoked as a substitute for meaningful analysis.   As Judge Posner has properly queried, "'Self-concealing' sounds good, but what does it mean?" *Martin v. Consultants & Adm'rs, Inc.*, 966 F.2d 1078, 1103 (7th Cir. 1992) (Posner, J., concurring).  Moreover, as Professor Richard Marcus has pointed out, the definition of a self-concealing act "suffers from an inherent, and probably unavoidable, tautology." Richard L. Marcus, *Fraudulent Concealment in Federal Court: Toward a More Disparate Standard?*, 71 Geo. L.J. 829, 870 (1983).

> A wrong is "inherently concealed" whenever it is "unknowable" despite the absence of affirmative concealment. Obviously it was not "unknowable" forever, since the plaintiff must have discovered it at some time in order to sue and bring the statute of limitations problem to the attention of a court in the first place. The real question, therefore, is whether it was "unknowable" until the discovery of the claim. What could be better proof that it was unknowable than the fact that the plaintiff did not discover it despite due diligence? The "inherently unknowable" wrong consequently becomes the obverse of due diligence -- a wrong that a plaintiff even by the exercise of due diligence, could not uncover. When all else fails, this fallback notion apparently will obviate proof of concealment for the diligent plaintiff.

*Id.*

Fortunately, the Court need not in this case plumb the depths of the concept of a self-concealing violation or attempt to bring order from the case law.  Instead, it will suffice for present purposes to note that there are two basic requirements to toll the statute of limitations on the basis of a self-concealing violation.

First, the violation must be of such a nature as to be "self-concealing." Not every fraud is self-concealing; otherwise, the exception would swallow the rule. Therefore, at the outset a court must determine whether the particular fraud alleged is, by its nature, inherently unknowable.

Second, even if the fraud is self-concealing, the plaintiff still must have exercised reasonable diligence to discover the cause of action under the circumstances. Thus, *Bailey* held that tolling is available "when there has been no negligence or laches on the part of a plaintiff in coming into the knowledge of the fraud." *Bailey*, 88 U.S. at 349-50; *see Hendrickson Bros., Inc.*, 840 F.2d at 1083-84; *In re Publ'n Paper*, 2005 WL 2175139, at *3-*5; *Abbott Mortgage*, 459 F. Supp. at 120 ("The requirement that the fraud 'conceal itself' must mean more than that the plaintiff is ignorant of the deception."). As Professor Marcus has explained, the due diligence requirement "flows naturally from the underlying purpose of the fraudulent concealment doctrine, which is to avoid unfair application of the statute of limitations. A plaintiff who has not acted reasonably to protect his own interests may not cry foul when his belated claim is barred." Marcus, *supra*, at 874-75.[6]

OBG's Second Amended Complaint satisfies neither requirement. As to the first requisite, OBG simply recites in its complaint in a conclusory manner the legal conclusion that Northrop Grumman's "intentional failure to disclose the true nature and condition of Best Friends Property was

---

[6] In many cases, the two requirements – self-concealing violation and due diligence – may collapse upon themselves, leaving due diligence as the only real criterion. *See* Marcus, *supra*, at 870 ("[The] collateral possibility of labeling a defendant's conduct as 'inherently self-concealing' . . . tends to confirm the suspicion that diligence is presently the only real criterion."). This is not always the case, however. For example, suppose a fraud is inherently unknowable but a year after the fraud is committed, the plaintiff receives an anonymous letter advising him of the fraud. In those circumstances, the first requirement would be satisfied, but if the plaintiff simply ignored the letter, the plaintiff might not be able to satisfy the requirement that he act with due diligence to discover the fraud.

a self-concealing violation because without the concealment of the true nature and condition of the Best Friends Property, the violation against OBG could not have taken place." Second Am. Compl. [doc. # 43] ¶¶ 72, 104, 112. However, OBG fails to allege any facts with sufficient particularity, in accordance with Rule 9(b), to show why Northrop Grumman's fraud was self-concealing in nature.

As the Supreme Court has cautioned,

While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of a cause of action's elements will not do. Factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all of the complaint's allegations are true."

*Twombly*, ___U.S. at ____, 127 S. Ct. at 1959. Or as the Second Circuit put it in *Iqbal*, even the "flexible 'plausibility standard' [of Rule 8], obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render a claim *plausible*." *Iqbal*, 490 F.3d at 157-58. OBG does no such thing. And in this case, of course, OBG must satisfy the heightened standards of Rule 9(b), a standard that OBG simply does not meet.

Based on the allegations of OBG's own complaint, information regarding contamination of the soil on the Plainville Site and the scope of the contamination was readily discoverable by OBG, if not already known to OBG, since it had been retained by Northrop Grumman as its environmental consultant to conduct an investigation of contamination on the site for purposes of preparing a remediation plan for the site. Indeed, before acquiring the Property, OBG had determined "the extent and degree of soil and ground water pollution resulting from the waste waters discharged on-site, the leaking fuel oil storage tanks and the disposal of . . . solid waste on the [Plainville Site]." Consent Order Plan, ¶ 7. Therefore, OBG's bald and conclusory invocation of the words "self-

concealing" does not suffice to make its claim of fraudulent concealment plausible. *See In re Publ'n Paper*, 2005 WL 2175139, at \*3-\*5 (discussing how conclusory allegations of self-concealment are insufficient).

The Court does not mean to suggest that fraud claims involving environmental contamination can never be self-concealing. Presumably, they can. But here, OBG was neither a naive consumer nor unfamiliar with environmental pollution generally, or contamination at the Plainville Site in particular. OBG had access to the site before acquiring the Property as Northrop Grumman's environmental consultant, and OBG performed testing, monitoring, and reporting regarding contamination on the Plainville Site, including Best Friends' property, in the many years that followed its acquisition of the Property and preceded the filing of this action. In those circumstances, OBG was obliged to allege facts sufficient to show that the particular fraud alleged was unknowable to OBG, a burden that it has not shouldered. And, the Court might add, a burden that OBG apparently cannot satisfy, in view of its counsel's representations that he had included in the Second Amended Complaint all of the facts that support OBG's claims that he could allege consistent with his obligations under Rule 11. *See id.* ("[plaintiffs] have alleged nothing more than the conclusion that the conspiracy here was 'inherently self-concealing.' . . . [T]here is nothing in the complaint that indicates why the plaintiffs . . . would have been misled."); *Abbott Mortgage*, 459 F. Supp. at 120 ("[M]any items were known to the plaintiff that should have alerted him to the practices he now complains of . . . . [T]he record does not support a finding that they were incapable of being known, and that the fraud therefore 'concealed itself.'").

Moreover, even if OBG's conclusory assertion that Northrop Grumman's alleged fraud was self-concealing were sufficient, OBG fails to allege any facts demonstrating that it exercised

reasonable diligence to discover Northrop Grumman's fraud. While there is some confusion in the case law regarding who has the burden of showing reasonable diligence,[7] the Court agrees with its colleague Judge Stefan R. Underhill that the "plaintiff must also establish that the failure to discover the concealment earlier was not the result of any lack of diligence." *In re Publ'n Paper*, 2005 WL 2175139, at *5; *cf. Martinelli v. Bridgeport Roman Catholic Diocesan Corp.*, 196 F.3d 409, 428 (2d Cir. 1999) ("[I]n cases not involving a fiduciary relationship, § 52-595 places the burden of proving both the plaintiff's ignorance and the defendant's fraudulent concealment on a plaintiff who seeks to assert and benefit from a finding of the defendant's fraudulent concealment.").

"Typically, a plaintiff will prove reasonable diligence either by showing that: (a) the circumstances were such that a reasonable person would not have thought to investigate, or (b) the plaintiff's attempted investigation was thwarted." *In re Publ'n Paper*, 2005 WL 2175139, at *5. OBG has pleaded neither. OBG asserts in wholly conclusory manner that it did not have access to Best Friends' property and was therefore thwarted from exercising reasonable diligence. *See* Second Am. Compl. [doc. # 43] ¶ 73. But OBG fails to allege that it ever even asked for such access. Moreover, according to the allegations of the Second Amended Complaint, OBG performed a variety of work on Best Friends' property in the years before and after OBG's acquisition of the Property.

---

[7] *Compare, e.g.*, *Geils Band Employee Ben. Plan v. Smith Barney Shearson, Inc.*, 76 F.3d 1245, 1259 (1st Cir. 1996) ("[W]e place the burden of showing reasonable diligence on the defendant when the plaintiff alleges that the statute is tolled by a self-concealing wrong, such that defendants have the burden of coming forward with any facts showing that the plaintiff could have discovered . . . the cause of action if he had exercised due diligence.") (internal citations and quotation marks omitted), *with Texas v. Allan Const. Co.*, 851 F.2d 1526, 1530 n.20 (5th Cir. 1988) ("It is settled in our circuit . . . that even where the plaintiff has shown affirmative acts of concealment, the plaintiff bears the burden of showing his diligence.").

Indeed, OBG's case is premised on data that OBG collected from a well located on Best Friends' property that OBG regularly monitored. *See id.* ¶ 47.

OBG also claims its efforts to conduct reasonable diligence were thwarted based on restrictions on its access to Best Friends' property established by Northrop Grumman when OBG served as Northrop Grumman's contractor. *See* Pl.'s Mem. in Opp'n to Northrop Grumman's Mot. to Dismiss [doc. # 59] at 8. The Court is unclear, to say the least, how any restrictions placed on OBG *as a contractor* would somehow satisfy OBG's due diligence requirements once it decided to acquire the Property. Unlike in many contracts that are similar in nature to the Purchase Agreement, there is no indication that OBG even asked for any representations or warranties from Northrop Grumman regarding the environmental conditions on the Property or the extent of pollution on Best Friends' property. And, of course, we know that Northrop Grumman made no such representations or warranties. Therefore, OBG has failed to plead facts with sufficient particularity or even reasonable plausibility to demonstrate that it exercised reasonable diligence to discover the alleged fraud. *See Abbott Mortgage*, 459 F. Supp. at 113-115. Formulaic recitation of conclusory claims of diligence will not suffice. *See Twombly*, ___ U.S. at ___, 127 S. Ct. at 1965; *Iqbal,* 490 F.3d at 157-58.

For these reasons, the Court concludes that the allegations of OBG's Second Amended Complaint are insufficient to allow OBG to invoke the doctrine of fraudulent concealment to toll the statute of limitations that otherwise precludes its tort claims against Northrop Grumman.

### 2.     Continuing Course of Conduct

OBG alternatively asserts that the limitation periods for its tort claims should be tolled because Northrop Grumman engaged in a "continuing course of conduct" by failing to disclose the

alleged torts to OBG despite the ongoing contractual relationship between the parties. Under

Connecticut law, to toll a statute of limitations based on the continuing course of conduct doctrine

> there must be evidence of the breach of a duty that remained in existence after
> commission of the original wrong related thereto. That duty must not have
> terminated prior to commencement of the period allowed for bringing an action for
> such a wrong . . . . Where we have upheld a finding that a duty continued to exist
> after the cessation of the act or omission relied upon, there has been evidence of
> *either a special relationship between the parties giving rise to such a continuing duty*
> *or some later wrongful conduct of a defendant related to the prior act.*

*Neuhaus v. DeCholnoky*, 280 Conn. 190, 201 (2006) (emphasis added). Here, OBG does not allege

any "later wrongful conduct" by Northrop Grumman. Instead, OBG contends that it had a "special

relationship" with Northrop Grumman based on their contractual relationship. More specifically,

OBG argues that

> [b]ecause the transaction between OBG and [Northrop Grumman] lasted over an
> extended duration after the initial transfer of the Property in that [Northrop
> Grumman] paid OBG regular payments for its work during the O&M phase,
> [Northrop Grumman]'s duty to disclose its knowledge of the condition of the Best
> Friends Property continued over the period that OBG ran the Product Recovery
> System.

*See* Pl.'s Opp'n to Northrop Grumman's Mot. to Dismiss [doc. # 59] at 20.

As with its fraudulent concealment claim, however, OBG cites no Connecticut cases holding

that a mere contractual relationship between two sophisticated commercial entities constitutes a

"special relationship" that would allow a plaintiff to toll a statute of limitations under the continuing

course of conduct doctrine. In fact, the law of Connecticut is precisely to the contrary. Thus, in

*Fichera*, the Connecticut Supreme Court considered similar factual circumstances involving alleged

misrepresentation claims related to a purchase of land. There, the court concluded that the

continuing course of conduct doctrine did not apply because the agreement to purchase land did not

constitute a special relationship, and the defendant took no wrongful affirmative actions after the alleged initial misrepresentation. *See Fichera*, 207 Conn. at 209-13; *see also Thompson v. Prudential Ins. Co. of Am.*, No. CV990065632S, 2003 WL 21151630, at *1 n.3 (Conn. Super. Ct. May 6, 2003) ("[T]he plaintiff has failed to satisfy [the special relationship] requirement of the doctrine because a 'contractual relationship' does not give rise to an ongoing legal duty and our Supreme Court has so held.") (citing *Fichera*, 207 Conn. at 210); *Partitions, Inc. v. Blumberg Assocs., Inc.*, No. CV980576664S, 2001 WL 1332174, at *5 (Conn. Super. Ct. Oct. 9, 2001) ("[T]he contractual relationship was not a 'special relationship' for the purpose of the continuing course of conduct doctrine: generally these relationships have been attorney-client, physician-patient, or some related sort of fiduciary-type relationship in which one party reasonably reposes trust in the other to exercise continuing care on his behalf.").

Were the Court to accept OBG's contention that a duty to disclose existed in all arm's-length contracts between commercial parties where one party is alleged to have "superior knowledge," the statute of limitations would be perpetually tolled for nearly all commercial or contract-related claims. This would make no sense and would undermine the salutary purposes served by statutes of limitations. *See generally Am. Pipe & Constr. Co. v. Utah*, 414 U.S. 538, 554-55 (1974) (discussing the function of statute of limitations). Because on the basis of the allegations of the Second Amended Complaint, there was no "special relationship" between OBG and Northrop Grumman, the Court concludes that OBG cannot take advantage of the continuing course of conduct doctrine to save its otherwise time-barred tort claims.

In sum, OBG's tort claims are barred by the relevant statutes of limitations and therefore the Court will grant Northrop Grumman's motion to dismiss as to Counts I, III, V, VI, and VII of OBG's Second Amended Complaint.

**B.    CONTRACT CLAIMS**

OBG asserts three contract-related claims against Northrop Grumman. Count II alleges that Northrop Grumman breached its Purchase Agreement with OBG in two ways: first, by failing to renegotiate the terms of the Purchase Agreement following the DEP's adoption of the 1995 and 1997 Regulations and because of the "excess" contamination of the Property; and second, by failing to indemnify OBG for the costs it has incurred as a result of the migration of free-floating product from Best Friends' parcel onto OBG's Property.[8] In addition, Court IV alleges an unjust enrichment claim, which OBG pleads as an alternative to its breach of contract claim.

The Court begins by identifying which law governs OBG's contract claims. "In diversity cases, federal courts look to the laws of the forum state in deciding issues regarding conflicts of law." *Wall v. CSX Transp., Inc.*, 471 F.3d 410, 415 (2d Cir. 2006). Here, Article XII of the Purchase Agreement states that the "Agreement shall be construed and enforced under the laws of the State of New York." The Connecticut Supreme Court has explained that

> parties to a contract generally are allowed to select the law that will govern their contract, unless either: "(a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice,

---

[8] In its Complaint, OBG also initially asserted that "Northrop Grumman/TRW breached the Purchase Agreement by failing to obtain all regulatory approvals for the Consent Order Plan, including performance specifications, environmental permits, and any required access to the adjoining real property (Best Friends Property), including easements required for implementation and completion of the work provided for under the Consent Order Plan and the O&M Work." Second Am. Compl. [doc. # 43] ¶ 83. However, OBG did not pursue this claim in subsequent briefing and as such the Court deems it to be abandoned.

or (b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of § 188 [of the Restatement (Second) of Conflict of Laws], would be the state of the applicable law in the absence of an effective choice of law by the parties."

*Elgar v. Elgar*, 238 Conn. 839, 850-51 (1996) (citing Restatement (Second) of Conflict of Laws § 187 (1971)). OBG is a corporation organized under the laws of New York and, thus, New York has a substantial relationship to the parties. In addition, neither party has asserted, nor has the Court found, that applying New York law to the substantive provisions of the Purchase Agreement would be contrary in any way to any fundamental policy of the State of Connecticut. Therefore, the Court will apply New York law in considering the substantive provisions of the Purchase Agreement.

### 1.     Unjust Enrichment

Before turning to the contract claims, however, the Court will briefly address OBG's unjust enrichment claim. In Count IV, OBG alleges that Northrop Grumman was unjustly enriched because it failed to compensate OBG for the additional remediation costs associated with the 1995 and 1997 Regulations. Second Am. Compl. [doc. # 43] ¶¶ 92-96.

The Second Circuit has instructed that "[i]t is impermissible . . . to seek damages in an [unjust enrichment] action . . . where the suing party has fully performed on a valid written agreement, the existence of which is undisputed, and the scope of which clearly covers the dispute between the parties." *Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc.*, 448 F.3d 573, 587 (2d Cir. 2006) (citing *Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.*, 70 N.Y.2d 382, 388 (1987)); *see also Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp.*, 418 F.3d 168, 175-76 (2d Cir. 2005) ("[A] plaintiff's entitlement to recover in quantum meruit outside of a valid contract may depend on a showing that the 'additional services' are so distinct from the

[contractual] duties . . . that it would be unreasonable for the [defendant] to assume that they were rendered without expectation of further pay.") (alteration in original and quotation marks omitted).

Here, OBG claims that Northrop Grumman was obligated, under the terms of their Purchase Agreement, to compensate OBG for the additional remediation required (according to OBG) by the Regulations. As stated by OBG in its complaint,

> OBG performed its contractual obligations under the Purchase Agreement, and also secured the DEP's approval of a Site Certification Report.
> Northrop Grumman[] has been unjustly enriched by failing to reimburse OBG for additional remediation measures imposed by the DEP relating to the Property and which Northrop Grumman[] is obligated to compensate [OBG] for.

Second Am. Compl. [doc. # 43] ¶¶ 93, 94. Notably, OBG does not contest the validity of the Purchase Agreement, but rather attempts to enforce the terms of the Purchase Agreement in the manner in which OBG interprets them. In other words, OBG's unjust enrichment action attempts to recover damages for expenses that OBG asserts are covered under the Purchase Agreement. As the Second Circuit's decision in *Beth Israel Medical Center* makes clear, in those circumstances an unjust enrichment claim is impermissible.

OBG responds, however, that it is entitled to allege an unjust enrichment claim "in the alternative" in the event it does not succeed on its breach of contract claims. In effect, OBG contends that it may assert an unjust enrichment claim in the event it does not receive relief under its breach of contract claim. *See* Pl.'s Mem. in Opp'n to Northrop Grumman's Mot. to Dismiss [doc. # 59] at 29. This is not the law of New York (or Connecticut, for that matter). *See Meaney v. Conn. Hosp. Ass'n*, 250 Conn. 500, 558 (1999) ("As Professor E. Allan Farnsworth has observed: 'It is often said that an express contract between the parties precludes recognition of an

implied-in-law contract governing the same subject matter.'") (quoting 1 E. Farnsworth, *Contracts* § 2.20, at 176 (2d ed.1998)).

If OBG were challenging the validity of the Purchase Agreement or asserting that the subject matter of its unjust enrichment claim fell outside the scope of the Purchase Agreement, OBG might be able to pursue a quasi-contractual claim. *See, e.g.*, *Mathias v. Jacobs*, 238 F. Supp. 2d 556, 572 (S.D.N.Y. 2002). But that is not what OBG has alleged. OBG does not dispute the validity of the Purchase Agreement and it is apparent that the Purchase Agreement covers all of the subjects of OBG's unjust enrichment claim – renegotiation, payments for contamination of the Plainville Site, and indemnification. Therefore, if OBG fails to prove that Northrop Grumman breached the Purchase Agreement in the manner in which it dealt with those subjects, OBG cannot invoke a cause of action for unjust enrichment to recover amounts to which it is not entitled under the express terms of the parties' valid contract. *See, e.g.*, *Gianascio v. Giordano*, No. 99 CV 1796 GBD, 2003 WL 22999454, at *3-*5 (S.D.N.Y. Dec. 19, 2003). Accordingly, the Court will grant Northrop Grumman's motion to dismiss Count IV of OBG's Second Amended Complaint.[9]

_____

[9] Northrop Grumman also argues that OBG's unjust enrichment claim is preempted by the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9601 *et seq*. *See* Northrop Grumman's Mot. to Dismiss [doc. # 34] at 25-26. Specifically, Northrop Grumman relies on the Second Circuit's language in *Bedford Assocs. v. Sills*, 156 F.3d 416 (2d Cir. 1998), in which the court stated that § 113(f) of CERCLA "preempts the state law remedies of restitution and indemnification." *Id*. at 427. Because the law regarding what relief is available under § 113(f) has undergone recent reevaluation by the Supreme Court, *see United States v. Atl. Research Corp.*, __U.S.__, 127 S. Ct. 2331 (2007); *Cooper Indus., Inc. v. Aviall Servs., Inc.*, 543 U.S. 157 (2004), and because OBG's unjust enrichment claim fails on other grounds, the Court will not reach the question of whether OBG's unjust enrichment claim is preempted by CERCLA.

## 2. Failure to Renegotiate

In Count II, OBG alleges that the DEP's implementation of the 1995 and 1997 Regulations, as well as the migration of free-floating product from Best Friends' property to the Property, triggered Northrop Grumman's obligation under the Purchase Agreement to renegotiate its terms. In support of its claim that Northrop Grumman was obligated to renegotiate the Purchase Agreement, OBG does not rely on the express provisions of the Purchase Agreement, but rather relies solely on Recital E of the Purchase Agreement's preamble, which states:

> [OBG]'s proposal is based in part upon DEP's determination letter dated December 19, 1989 characterizing the impoundment sludge and soils on the [Property] and on Best Friends Property for purposes of performing the Consent Order Plan Work and this Agreement shall be subject to renegotiation . . . if the total petroleum hydocarbon ("TPH") threshold treatment level required on the affected properties is more stringent than 20,000 ppm.

OBG's claim that Northrop Grumman breached the Purchase Agreement by failing to renegotiate its terms fails for several reasons. For one, despite OBG's reliance on the Purchase Agreement's recital language, the plain language of the Purchase Agreement does not comport with OBG's argument that Northrop Grumman was obligated to renegotiate the Purchase Agreement following the DEP's adoption of the 1995 and 1997 Regulations or as a result of the migration of product from Best Friends' parcel. Under New York law, which governs this contract, "the meaning of a contract that is unambiguous is a question of law for the court to decide." *Revson v. Cinque & Cinque, P.C.*, 221 F.3d 59, 66 (2d Cir. 2000); *see also Kohl's Dept. Stores, Inc. v. Rongrant Assocs., LLC*, No. 04-CV-4907 (NGG)(MDG), 2005 WL 1263613, at *1 (E.D.N.Y. May 27, 2005) ("Accordingly, issues of contract interpretation are generally matters of law and therefore suitable for disposition on a motion to dismiss."). "A contract is unambiguous if it 'has a definite and precise

meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference of opinion.'" *Payday Advance Plus, Inc. v. Findwhat.com, Inc.*, 478 F. Supp. 2d 496, 502 (S.D.N.Y. 2007) (alteration in original and quotation marks omitted) (quoting *Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Pension Plan*, 7 F.3d 1091, 1095 (2d Cir.1993)); *see also Bethlehem Steel Co. v. Turner Const. Co.*, 141 N.E.2d 590, 593 (N.Y. 1957) (stating that an interpretation of a contract should not "strain[] the contract language beyond its reasonable and ordinary meaning").

Here, the language of the Purchase Agreement is unambiguously clear that renegotiation was not required in the circumstances alleged in the Second Amended Complaint. While the Purchase Agreement's preamble generally refers to the possibility of renegotiation, the Purchase Agreement's substantive provisions include explicit language defining the precise scope of the parties' obligations regarding renegotiation. Specifically, Article VI(b) provides that:

> If the TPH threshold treatment level [in the Consent Order Plan] is more stringent than 20,000 ppm, [Northrop Grumman]'s obligation to pay the $250,000 down payment and [OBG]'s obligation to commence work shall be suspended pending resolution of the amount of additional time or compensation for the performance of the Consent Order Plan as set forth below in this Article and Article X.

Article VI(c) states:

> [Northrop Grumman] shall pay to [OBG] an additional amount *to be agreed upon*, not to exceed the sum of Sixty Five Dollars ($65.00) per ton . . . for each additional ton of soil required to be treated due to the adoption of TPH threshold treatment standards more than the 20,000 ppm threshold . . . . Such additional amount shall be paid in monthly installments pursuant to a *mutually agreed upon* schedule."

(Emphasis added). Significantly, Article X(b) provides as follows:

> [If] [t]he Consent Order Plan approved by DEP specifies a TPH threshold treatment level more stringent than 20,000 ppm and the parties are unable to agree on the additional time required for performance and the additional compensation to be paid

for performance of the Consent Order Plan within thirty days of the date of DEP's approval of the Consent Order Plan . . . then either party may terminate this Agreement by providing written notice of termination to the other party. Upon such termination, all obligations of the parties under this Agreement shall terminate.

In considering the language of the covenants of the Purchase Agreement relative to the language of the recitals, "[w]e begin with the basic contract law principles that contracts are to be interpreted as a whole." *United States v. Hamdi*, 432 F.3d 115, 123 (2d Cir. 2005) (citing Restatement (Second) of Contracts § 202(2) (1981) and 11 Richard A. Lord, *Williston on Contracts* § 32:5 (4th ed.1999)). However, the Second Circuit has instructed that "[a]lthough a statement in a 'whereas' clause may be useful in interpreting an ambiguous operative clause in a contract, it cannot create any right beyond those arising from the operative terms of the document." *Aramony v. United Way of Am.*, 254 F.3d 403, 413 (2d Cir. 2001) (alteration in original and quotation marks omitted). Moreover, "it is a fundamental rule of contract construction that 'specific terms and exact terms are given greater weight than general language.'" *Id.* (quoting Restatement (Second) of Contracts § 203(c) (1981)). "Even where there is no 'true conflict' between two provisions, 'specific words will limit the meaning of general words if it appears from the whole agreement that the parties' purpose was directed solely toward the matter to which the specific words or clause relate.'" *Id.* at 413-14 (quoting 11 Lord, *supra*, § 32:10, at 449).

The more specific language of the operative provisions of the Purchase Agreement provides that renegotiation would occur only in certain circumstances and that any revisions to the agreement would be the result of the parties' mutual consent. Thus, the Purchase Agreement contemplated that if the Consent Order Plan included a more stringent TPH ppm threshold than that anticipated by the parties, the obligations under the Purchase Agreement would be suspended pending new *mutually*

*agreed upon* terms. Article X expressly provides that if the parties are unable to reach agreement on new terms *within thirty days of the date of the DEP's approval of the Consent Order Plan*, either party could then terminate the contract, at which point all obligations under the Purchase Agreement would terminate. The Purchase Agreement therefore contains an express remedy in the event the parties are unable to renegotiate the terms of the Purchase Agreement. Given Northrop Grumman's and OBG's right to terminate the Purchase Agreement if the parties were unable mutually to agree on new terms, the Court is unable to understand how the failure of the parties to reach acceptable agreement on new terms could constitute a breach of contract by Northrop Grumman.

Furthermore, the renegotiation provisions of the Purchase Agreement depend solely upon the thresholds for TPH *established in the Consent Order Plan*. Thus, Article XI provides that if the TPH threshold level in the Consent Order Plan is more stringent than 20,000 ppm, Northrop Grumman's obligation to pay *the initial down payment* would be suspended as would OBG's obligation "*to commence work*." Purchase Agreement, Art. XI(b) (emphasis added). Also, Article X(b) states that either party may terminate the contract if they do not agree on new terms "within thirty days of the date of DEP's approval of the Consent Order Plan." As OBG concedes, the Consent Order Plan's TPH threshold did not exceed 20,000 ppm and, therefore, these provisions of the Purchase Agreement never became operative. It was the later-adopted, generally applicable 1995 and 1997 Regulations, not the Consent Order Plan, that imposed the new limits that applied to OBG's Property. Indeed, the 1995 Regulation adjusted the TPH threshold levels one year after OBG claims it fulfilled its remediation obligations under the Consent Order Plan, *see* Second Am. Compl. [doc. # 43] ¶ 43, and five years after the Consent Order Plan was adopted by the DEP.

In short, there is nothing in the Purchase Agreement that required Northrop Grumman to renegotiate the terms of its compensation to OBG whenever the DEP adopted new regulations or whenever the pollution discovered on the Property became greater than OBG originally expected. The parties certainly could have included such a provision in their contract. But they did not.

Finally, OBG acknowledges that the requirements of the 1995 Regulations are effective "[u]pon the transfer of the Property to a new owner." *Id.* at 45. Therefore, if OBG never transfers the Property, there will be no need for it to conform to the more stringent 1995 Regulations. In that sense, OBG's conformance with the 1995 Regulations prior to transferring the Property would be purely voluntary. It is difficult for the Court to understand (and OBG provides no explanation) why Northrop Grumman would be compelled to renegotiate its compensation to OBG under the Purchase Agreement based on a voluntary decision by OBG to conduct further remediation on the Property in order to enhance the Property's purchase price. Certainly nothing in the Purchase Agreement imposes such an obligation.

For all of these reasons, the Court concludes that the clear and unambiguous terms of the Purchase Agreement cannot reasonably be read to require Northrop Grumman to renegotiate the terms of the Purchase Agreement on the grounds asserted in the Second Amended Complaint. Therefore, the Court grants Northrop Grumman's motion to dismiss OBG's breach of contract claim based on Northrop Grumman's alleged failure to renegotiate the terms of the Purchase Agreement.

### 3. Indemnification

In its Second Amended Complaint, OBG added a claim to Count II that Northrop Grumman breached its obligations under the Purchase Agreement by failing to indemnify OBG in accordance with Article V of the Purchase Agreement. *See* Second Am. Compl. [doc. # 43] ¶¶ 76-84.

Specifically, OBG asserts that, under the terms of the Purchase Agreement, Northrop Grumman was obligated to indemnify OBG for any costs related to the migration of pollutants from Best Friends' property onto OBG's Property. In pertinent part, Article V provides that "[e]xcept as otherwise specifically provided in this paragraph and in connection with the performance of any Work required on Best Friends Property under the Consent Order Plan or any required O&M Work, [OBG] shall have no responsibility for environmental conditions outside the physical boundaries of the [Property]." The parties referred to such conditions as "Off-Site Claims." The provision further provides that Northrop Grumman "shall indemnify and save harmless [OBG] from and against any and all loss and expense arising out of Off-Site Claims."

OBG contends that the express exclusion in the indemnification provision for any "Work required on Best Friends' property" or "any required O&M Work" does not pertain to contaminants migrating from Best Friends' property onto OBG's Property. Notably, however, OBG does not allege, or rely upon, any parol evidence, evidence of course of dealing or other extrinsic evidence to interpret the language of Article V. Instead, OBG's contention is based solely upon the text of the Purchase Agreement. Northrop Grumman moves to dismiss OBG's indemnification claim, arguing that it is both untimely and without merit.

Turning first to the issue of timeliness, Northrop Grumman argues that OBG's indemnification claim is barred by the relevant statute of limitations, which is six years regardless whether Connecticut or New York law applies. *See* Conn. Gen. Stat. § 52-576(a) (2007); *Roldan v. Allstate Ins. Co.*, 149 A.D.2d 20, 29-31 (N.Y. App. Div. 1989) ("[C]ause[] of action . . . based upon . . . contractual indemnification . . . [is] governed by the six-year Statute of Limitations applicable to actions founded upon breach of contract."). However, OBG asserts that its

indemnification claim falls within the statute of limitations because its claim did not accrue until 2005 "when [Northrop Grumman] stopped negotiating with OBG in good faith and stopped leading OBG to believe that it would fulfill its obligations." Pl.'s Opp'n to Northrop Grumman's Mot. to Dismiss [doc. # 59] at 24.

As noted earlier, it is clear that under Connecticut choice of law rules, New York law governs the substantive parameters of OBG's indemnification claim; ordinarily, however, Connecticut law would govern procedural issues, including the statute of limitations. *Lostritto v. Cmty. Action Agency of New Haven, Inc.*, 269 Conn. 10, 22 (2004) ("A statute of limitations is generally considered to be procedural, especially where the statute contains only a limitation as to time with respect to a right of action and does not itself create the right of action."); *Paine Webber Jackson & Curtis, Inc. v. Winters*, 22 Conn. App. 640, 649 (1990) ("The judicial rule of thumb [is] that in a choice of law situation the forum state will apply its own procedure," regardless of what substantive law is applied). However, which state's law guides the determination of when a claim for indemnification *accrues* for purposes of the statutes of limitations is less clear. The choice of law matters because if accrual is a matter of procedure – and therefore Connecticut law governs – OBG's indemnification claim would appear to be time-barred. *See Amoco Oil Co. v. Liberty Auto & Elec. Co.*, 262 Conn. 142, 153-54 (2007) ("The true test [in determining the date of accrual] is to establish the time when the plaintiff first could have successfully maintained an action. . . .To conclude that [plaintiff] did not suffer a loss until it actually discovered and paid for damage to its property would contravene well established principles of contract law.") (internal citations and quotations omitted). By contrast, if the time of accrual is a substantive matter – and New York law controls – OBG likely can bring an indemnification claim for any costs it incurred in the six years before filing this action

in November 2006. *See Varo, Inc. v. Alvis PLC*, 261 A.D.2d 262, 264 (N.Y. App. Div. 1999) ("[I]t is well settled that a cause of action based upon a contract of indemnification does not arise until liability is incurred by way of actual payment.") (alteration in original) (citing *Travelers Indem. Co. v. LLJV Dev. Corp.*, 227 A.D.2d 151, 154 (1996) and *McDermott v. City of New York*, 50 N.Y.2d 211, 216-17 (1980)); *cf. Tedesco v. A.P. Green Indus., Inc.*, 8 N.Y.3d 243, 247 (2007) (describing same time of accrual for third-party indemnification claim).[10]

One might have supposed that courts had developed clear rules for determining which state's law governs the time at which a cause of action accrues. But one would be mistaken. Connecticut courts do not appear to have dealt with this precise question, though case law suggests that the time at which an action accrues may be substantive in nature (which in this case, would mean that New York law would control). *See Weber v. U.S. Sterling Secs., Inc.*, 282 Conn. 722, 739 (2007) ("[S]ubstantive law creates, *defines and regulates* rights while a procedural law prescribes the methods of enforcing such rights or obtaining redress." (internal citations omitted) (emphasis added). Decisions addressing this issue in other jurisdictions, however, have concluded that the date of accrual should be determined by the law of the state that provides the statute of limitations (in this case, Connecticut). *See, e.g., Braniff Airways, Inc. v. Curtiss-Wright Corp.*, 424 F.2d 427, 430-31 (2d Cir. 1970) (finding that under New York law, the date of accrual is determined by the forum

---

[10] Thus, in an analogous case where a plaintiff sought third-party indemnification for a stream of payments, the New York Appellate Division held that the six-year statute of limitations commences at the time of each payment by the plaintiff. *See State v. Speonk Fuel, Inc.*, 307 A.D.2d 59, 61-63 (N.Y. App. Div. 2003). The court stated, "[P]laintiff's cause of action for indemnification accrues-and the six-year limitations period commences-each time the Fund makes a payment for cleanup and removal costs. Contrary to plaintiff's claims here, the limitations period does not commence/accrue only upon the Fund's final payment of such costs . . . . As such, [the] Supreme Court correctly determined that plaintiff is barred from recouping any payments made . . . more than six years before plaintiff's . . . commencement of this action." *Id.*

state);[11] *see also Hull v. Eaton Corp.*, 825 F.2d 448, 456 (D.C. Cir. 1987) (finding that the time of accrual is a statute of limitations question under District of Columbia law). Given the lack of clarity on this issue and the fact that the Court concludes that there is no merit to OBG's indemnification claim as pleaded, the Court will not decide whether OBG's indemnification claim (which, at best, is limited to amounts incurred after November 2000) is entirely barred by the applicable statute of limitations.

On the merits of OBG's indemnification claim, Northrop Grumman argues that from the face of the Second Amended Complaint it is apparent that the damages sought by OBG are related to work required by the Consent Order Plan and the O&M Work and as such, the damages are excluded under the plain language of Article V of the Purchase Agreement. Northrop Grumman also contends that Article V's indemnification provision relates only to third-party claims, not to claims between the two parties to the Purchase Agreement. The Court agrees with Northrop Grumman.

As with OBG's renegotiation claim, the Court believes that the indemnification provision of the Purchase Agreement is clear and unambiguous and that even taking the allegations of the complaint in the light most favorable to OBG, Northrop Grumman has no contractual obligation under the plain language of Article V to reimburse OBG for the costs of removing contaminants from OBG's Property that may have migrated onto OBG's Property from Best Friends' parcel. Instead, the Purchase Agreement obligated OBG to remediate contamination on the Property

---

[11] In *Braniff Airways*, the Second Circuit concluded that the date of accrual under New York law is determined by the forum state's law and not by the law of the state that provides the substantive rules governing the cause of action. The court reached this conclusion after applying New York's "interest analysis" choice of law rules under which it "examines each issue, and evaluates and weighs the competing policies expressed in each state's rule." 424 F.2d at 430. Connecticut, however, follows the "most significant relationship" test of the Restatement (Second) of Conflict of Laws. *See Am. States Ins. Co. v. Allstate Ins. Co.*, 282 Conn. 454, 461 (2007).

regardless of its source; it also provided that remediation of the Best Friends' parcel was a part of the work that would be required by the DEP under the Consent Order Plan. Indeed, the entire indemnity provision itself is expressly conditioned as follows: "Except as otherwise specifically provided in this paragraph and in connection with the performance of any Work required on Best Friends Property under the Consent Order Plan or any O&M Work." Purchase Agreement, Art. V.

Here, according to OBG's complaint, contaminants from Best Friends parcel migrated through the soil or groundwater onto OBG's Property during the course of OBG's remediation work on the site and these contaminants were then removed by OBG from its Property by the Product Recovery System that OBG was operating in connection with the Consent Order Plan and its O&M Work under the terms of the Purchase Agreement. *See* Second Am. Compl. [doc. # 43] ¶¶ 37-41, 73. Article V relieves OBG of responsibility only "for environmental conditions *outside the physical boundaries of the Site* or for claims of . . . damage incurred or alleged to have occurred *outside the physical boundaries* of the Site (such environmental conditions and claims collectively hereinafter called 'Off-Site Claims')." Purchase Agreement, Art. V (emphasis added). Nothing in the plain language of this provision allows OBG to transfer to Northrop Grumman contractual obligations that OBG had to remediate pollution occurring *on the site – that is, within the physical boundaries of the site* – and that are covered by OBG's obligations under the Consent Order Plan and the O&M Work.

Once again, the Purchase Agreement certainly could have adjusted OBG's on-site responsibilities under the Consent Order Plan and the Purchase Agreement based upon the ultimate source of contamination occurring on the site. But it did not. And the Court will not rewrite the parties' agreement for them. *See Krumme v. WestPoint Stevens Inc.*, 238 F.3d 133, 139 (2d Cir. 2000) ("Under New York law, therefore, a court must enforce that plain meaning, '[r]ather than

rewrite an unambiguous agreement.'") (internal citations omitted); *Bailey v. Fish & Neave*, 8 N.Y.3d 523, 528 (2007) ("[C]ourts 'may not by construction add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing.'") (internal citations omitted).  Therefore, the Court will grant Northrop Grumman's motion to dismiss Count II.

## IV. STATUTORY CLAIMS AGAINST BOTH DEFENDANTS

The Court next considers the state and federal statutory claims that OBG asserts against both Northrop Grumman and Best Friends.

### A. STATE STATUTORY CLAIMS

In Count VIII, OBG claims that it is entitled under state law to reimbursement from both Northrop Grumman and Best Friends for any expenses incurred as a result of the 1995 and 1997 Regulations promulgated by the DEP, as well as for any expenses arising from the migration of free-product from Best Friends' parcel onto OBG's Property.  *See* Second Am. Compl. [doc. # 43] ¶¶ 122-30.  OBG brings its claims under § 22a-452(a) of the Connecticut General Statutes, which provides that

> [a]ny person . . . which . . . removes or otherwise mitigates the effects of oil or petroleum or . . . hazardous wastes resulting from any discharge, [or] spillage . . . of such substance . . . shall be entitled to reimbursement from any person, firm or corporation . . . for the reasonable costs expended for such containment, removal, or mitigation, if such oil or petroleum or . . . hazardous wastes pollution or contamination . . . resulted from the negligence or other actions of such person, firm or corporation.

Conn. Gen. Stat. § 22a-452(a).  Because § 22a-452 does not provide its own statute of limitations, the parties agree that the statute of limitations set forth in § 52-577c applies to claims brought under § 22a-452.  *See* Mem. in Supp. of Best Friends' Mot. to Dismiss [doc. # 35] at 6; Pl's Opp'n to

Northrop Grumman's Mot. to Dismiss [doc. # 59] at 25; Northrop Grumman's Reply to Mot. to Dismiss [doc. # 62] at 9-10. Section 52-577c(b) provides, in pertinent part, that "no action to recover damages for personal injury or property damage caused by exposure to a hazardous chemical substance or mixture of hazardous pollutant released into the environment shall be brought but *within two years* from the date when the injury or damage complained of is discovered or in the exercise of reasonable care should have been discovered." Conn. Gen. Stat. § 52-577c(b) (emphasis added).

In its complaint, OBG alleges that Northrop Grumman and Best Friends are liable under §22a-452 because "OBG has incurred considerable expenses mitigating the effects of petroleum hydrocarbon *in accordance with the [1995 and 1997 Regulations] established by the DEP*." Second Am. Compl. [doc. # 43] ¶ 122 (emphasis added); *see id.* ¶¶ 44, 50-52. Here, the pleaded facts unequivocally show that OBG was aware of pollution on the Plainville Site and also was aware of the 1995 and 1997 Regulations long before 2004 – that is, two years before this case was filed. Simply because OBG says it did not fully understand the true extent of pollution on its Property is irrelevant in determining when OBG's cause of action accrued. *See Longobardi v. Shree Ram Corp.*, No. NNHCV054016755, 2006 WL 2556578, at *3 (Conn. Super. Ct. Aug. 15, 2006) (citing *Burns v. Hartford Hosp.*, 192 Conn. 451, 460 (1984)). Indeed, a decision OBG itself cites expressly states that the "'statute of limitation runs . . . under . . . § 52-577c(b) . . . from . . . the date the plaintiff acquired the property with knowledge of its contaminated state.'" *70 Water St. Assocs., LLC v. Harris & Gans Co.*, No. CV000180713, 2005 WL 895764, at *4 (Conn. Super. Ct. Mar. 7, 2005) (quoting *Cadlerock Props. Joint Venture, L.P. v. Schilberg*, No. CV9969263S, 2001 WL 950233 (Conn. Super. Ct. July 17, 2001)). The "fact that it later became apparent that the damage was

somewhat more extensive than first suspected is of no moment." *Longobardi*, 2006 WL 2556578, at *3. Thus, OBG's §22a-452 claims based upon its increased obligations under the 1995 and 1997 Regulations fall well outside the applicable statute of limitations.

OBG's § 22a-452 claim based upon the migration of contaminants from Best Friends' property onto OBG's Property is slightly more nuanced.[12] OBG acknowledges that it "was aware that it acquired the Property in a contaminated state." Pl's Opp. to Northrop Grumman's Mot. to Dismiss [doc. # 59] at 26. However, OBG asserts that its claim "is based upon when OBG first discovered the *migration* of off-site contamination from the Best Friends Property, *not* when OBG allegedly knew that the Best Friends Property was contaminated." *See* Pl's Opp. to Best Friends' Mot. to Dismiss [doc. # 60] at 5. Notably, OBG does not allege that its § 22a-452 cause of action was fraudulently concealed by either Defendant. Rather, OBG asserts in conclusory manner that it did not *discover* that it had a cause of action against anyone until 2004, and therefore its cause of action did not accrue until 2004.

Defendants move to dismiss this claim on the grounds that OBG knew of the migration of pollution long before 2004. As Best Friends puts it in its brief, OBG's contention that it only discovered that pollution was migrating from Best Friends' land "is simply implausible and contrary to the balance of the facts alleged." Best Friends' Reply to Mot. to Dismiss [doc. # 61] at 1-2. Best Friends observes that in its complaint, OBG acknowledges that, prior to November 2004, it had removed free product from wells on Best Friends' land but "amazingly, OBG disavows any notice

---

[12] It is not entirely clear from the Second Amended Complaint whether OBG is asserting this particular § 22a-452 claim against both Defendants or only against Best Friends. Therefore, the Court will assume that this claim is asserted against both Defendants.

that such recognized contaminants may be migrating to its downgradient, neighboring Property." *Id.* at 2 n.1.

Section 52-577c requires that OBG's claim "be brought but within two years from the date when the injury or damage complained of is discovered or *in the exercise of reasonable care should have been discovered*." Conn. Gen. Stat. § 52-577c(b) (emphasis added). The Connecticut Supreme Court recently emphasized that under § 52-577c(b), the question is not one of when, had the plaintiff exercised reasonable care, the cause of action *could* have been discovered but rather when in the exercise of reasonable care, it *should* have been discovered. *See Lagassey v. State*, 268 Conn. 723, 749-50 (2004); *Tolchin v. Shell Oil Co.*, No. X03CV970510328S, 2004 WL 1965848 (Conn. Super. Ct. July 30, 2004) (applying the holding in *Lagassey* to § 52-577c). The Court acknowledges that ordinarily determining when a plaintiff in the exercise of reasonable care should have discovered actionable harm presents a question of fact. *See Lagassey*, 268 Conn. at 749. However, in this particular case, the Court believes that OBG has failed to allege facts from which it is reasonably plausible to conclude that in the exercise of reasonable care, OBG should not have discovered migration of pollution from Best Friends' site until November 2004.

Notably, nowhere in its complaint does OBG say what, if anything, it did to try to determine the source of the continuing flow of product that was being pulled from the Product Recovery System on OBG's site. As OBG alleges, it originally expected to complete all remediation work on its Property by approximately 1995, but year after year thereafter OBG continued to pull free-floating product from its Product Recovery System. Yet, all the complaint alleges is that OBG did not discover that the product was migrating from Best Friends' property until it turned the Product Recovery System off in 2004. OBG provides no explanation (and did not do so at oral argument

44

either) why the system could not have been shut off sooner to discover the source of the continuing pollution or what efforts, if any, OBG took to discover why it was taking longer to remediate contamination on the site or why it was pulling substantially more product out of the recovery system than it had originally expected. Indeed, OBG does not say anything in its complaint about what, if anything, it did in the years between 1995 and 2004 to discover the source of the continuing and supposedly unexpected pollution. That omission is telling in view of the opportunity the Court afforded OBG to amend its complaint in response to Defendants' motions to dismiss. While Rule 12(b)(6) may not permit dismissal of a well-pleaded complaint simply because "it strikes a savvy judge that actual proof of those facts is improbable," the "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, ___ U.S. at ___, 127 S. Ct. at 1965; *Iqbal*, 490 F.3d at 157-58. That is a standard that OBG simply has not met, and apparently cannot meet. In short, its conclusory assertion of reasonable diligence is not reasonably plausible in the circumstances it has alleged. Therefore, the Court will grant Defendants' motion to dismiss OBG's § 22a-452 claim, Count VIII.

## B.    FEDERAL STATUTORY CLAIMS

In Count IX, OBG asserts federal statutory claims under CERCLA, demanding contributions from Best Friends and Northrop Grumman on the same grounds as asserted in support of its state statutory claims. As the parties acknowledge, the timeliness of OBG's CERCLA claim turns on whether the remediation efforts undertaken by OBG pursuant to the Purchase Agreement were "remedial actions" or "removal actions," as those terms are defined by CERCLA. For depending upon how OBG's actions are characterized, different statutes of limitations apply. The statute of limitations for recovery of costs related to "removal actions" is three years after the completion of

the removal action. *See* 42 U.S.C. § 9613(g)(2)(A), while the limitations period for recovery of costs related to "remedial actions" is six years after the initiation of physical on-site construction of the remediation, *see* 42 U.S.C. § 9613(g)(2)(B). During oral argument, OBG's counsel conceded that if the Court concluded that OBG's actions were remedial actions, as defined by CERCLA, its claim under Count IX would be barred by the statute of limitations since remedial efforts began in 1991, fifteen years before the initiation of this lawsuit. However, if the Court were instead to classify OBG's activities as "removal" actions, certain actions taken by OBG after 2003 may fall within the three-year statute of limitations provided under CERCLA. *See Schaefer v. Town of Victor*, 457 F.3d 188, 195-96 (2d Cir. 2006) ("Because of this difference in limitations periods, whether an activity is a 'removal action' or a 'remedial action' under § 107(a) can be determinative of the timeliness of a claim.").

CERCLA provides, in pertinent part, as follows:

> The terms "remove" or "removal" means the cleanup or removal of released hazardous substances from the environment, such actions as may be necessary taken [sic] in the event of the threat of release of hazardous substances into the environment, such actions as may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances, the disposal of removed material, or the taking of such other actions as may be necessary to prevent, minimize, or mitigate damage to the public health or welfare or to the environment, which may otherwise result from a release or threat of release.

42 U.S.C. § 9601(23).

> The terms "remedy" or "remedial action" means those actions consistent with permanent remedy taken instead of or in addition to removal actions in the event of a release or threatened release of a hazardous substance into the environment, to prevent or minimize the release of hazardous substances so that they do not migrate to cause substantial danger to present or future public health or welfare or the environment.

*Id.* § 9601(24). Congress did not articulate an explicit rationale for providing different limitations periods for remedial and removal efforts.[13] However, one scholar has surmised that

> [i]n order to encourage timely filing of cost-recovery actions to recover removal costs, Congress chose a relatively short time period–three years. However, perhaps in order to avoid having litigation interfere with the urgent measures associated with action, the limitations period does not begin until the removal is "complete." Congress presumably chose to delay the removal action period on the assumption that removals would be relatively short in duration and would happen early in the life of a site. Because the emergency-type action would be completed at that point, the parties could litigate liability for costs without adverse impact on the cleanup.
>
> Conversely, because remedial action is typically much longer and sometimes seemingly infinite in duration, Congress must have been reluctant to delay the start of the limitations period until the remedy was complete. Instead, it imposed a longer six-year period that begins when the remedial action is initiated. The longer period gives the cost-recovery plaintiff time to get the cleanup well underway before having to bring suit.

Jerry L. Anderson, *Removal or Remedial? The Myth of CERCLA's Two-Response System*, 18 Colum. J. Envtl. L. 103, 116-17 (1993).

The Second Circuit has explained that remedial actions are "generally long-term or permanent containment or disposal programs," while removal actions are "typically short-term cleanup arrangements." *New York v. Shore Realty Corp.*, 759 F.2d 1032, 1040 (2d Cir. 1985) (footnotes omitted). Whether OBG's actions are properly characterized as remedial or removal actions is a question of law for the Court to decide. *See Geraghty & Miller, Inc. v. Conoco Inc.*, 234 F.3d 917, 925-26 (5th Cir. 2000); *City of Moses Lake v. United States*, 458 F. Supp. 2d 1198, 1211 (E.D. Wash. 2006); *Cal. Dept. of Toxic Substances v. Alco Pac.*, 308 F. Supp. 2d 1124, 1135 n.10

---

[13] When CERCLA was initially enacted in 1980, Congress did not include express statutes of limitations in the statute for causes of actions related to remedial and removal actions. Congress later included statutory statutes of limitations in a 1986 Amendment to CERCLA. *See* Superfund Amendments and Reauthorization Act of 1986 ("SARA") Pub. L. No. 99-499, 100 Stat. 1613 (1986) (codified in scattered sections of 42 U.S.C.).

(C.D. Cal. 2004); *Cytec Indus., Inc. v. B.F. Goodrich Co.*, 232 F. Supp. 2d 821, 832 (S.D. Ohio 2002); *Advanced Micro Devices, Inc. v. Nat'l Semiconductor Corp.*, 38 F. Supp. 2d 802, 810 (N.D. Cal. 1999). In answering that legal question, however, a court ordinarily may benefit from a more fully-developed record. In fact, the Court has not found a case where another federal court resolved this issue on a motion to dismiss. To the contrary, the question can often generate substantial factual disputes. *See, e.g.*, *Colorado v. Sunoco, Inc.*, 337 F.3d 1233 (10th Cir. 2003) (reversing district court's granting of summary judgment based on determination that activities were remedial actions rather than removal actions); *Pub. Serv. Co. of Colo. v. Gates Rubber Co.*, 175 F.3d 1177, 1182 (10th Cir. 1999) ("Elements of [remedial and removal] response action[s] may overlap and semantics often obscure the actual nature of the cleanup performed.").

Here, however, both parties represented to the Court at oral argument that they would not introduce any new evidence or facts in connection with this claim beyond those that are set forth in the Second Amended Complaint, and they informed the Court that it could and should decide this issue based solely on OBG's pleadings. Therefore, in accordance with the parties' representations, the Court will decide the statute of limitations issues on the basis of the allegations in the Second Amended Complaint and the documents attached to it or incorporated in it.

OBG contends that its actions pursuant to the Purchase Agreement were removal rather than remedial actions. In support of its view, OBG relies on a line of cases concluding that removal efforts spanning multiple years can be viewed as a single removal action and therefore may be subject to the three-year statute of limitations, which would begin to run after the final activity in support of the removal efforts. *See Kelley v. E.I. DuPont de Nemours & Co.*, 17 F.3d 836

(6th Cir. 1994); *see also Sherwin-Williams Co. v. ARTRA Group, Inc.*, 125 F. Supp. 2d 739, 748 (D. Md. 2001) (citing *Kelley*).

For several reasons, the Court believes that the cases cited by OBG are distinguishable from the facts presented in this case, as disclosed in the Second Amended Complaint. For one, the question presented in those cases was a different question from the one presented here. In *Kelley* and *Sherwin-Williams*, the parties appeared to agree that the activities in question constituted removal actions; the dispute instead was about whether the statute of limitations ran from the earliest removal activity or whether all of the removal activities constituted a single removal action such that the statute of limitations would run only from the final removal activity. *See Kelley*, 17 F.3d at 840-44; *Sherwin-Williams Co.*, 125 F. Supp. 2d at 748. Therefore, the courts in *Kelley* and *Sherwin-Williams* were not required to decide whether the activities at issue constituted remedial, rather than removal, actions. *See Kelley*, 17 F.3d at 844; *Sherwin-Williams Co.*, 125 F. Supp. 2d at 748.

In addition, *Kelley* involved the emergency removal of hazardous pollutants. In *Kelley*, the defendant had disposed of large quantities of industrial waste in a landfill in fifty-five gallon drums that were found to be leaking. The landfill was accessible to the public and was located near homes, churches, schools, and a day-care center. Many of the residents closest to the landfill depended on groundwater for their domestic needs. Also, the landfill "was the site of frequent fires, some explosive, and fire officials reported that many of these fires were self-starting." *Kelley*, 17 F.3d at 838. As a consequence, the defendants in *Kelley* described the removal activity as an "emergency physical removal action under CERCLA," *id*. at 840, which is consistent with characterizing the activity as removal, rather than remediation, under CERCLA. *See Sunoco, Inc*., 337 F.3d at 1240 ("Generally, a removal action costs less, takes less time, and is geared to address an immediate

49

release or threat of release."); *ABB Indus. Sys., Inc. v. Prime Tech., Inc.*, 32 F. Supp. 2d 38, 42 (D. Conn. 1998) ("Removal actions are typically characterized as the removal of hazardous wastes in immediate response to an emergency situation . . . ."). Here, by contrast, OBG's clean-up activities are not described in the complaint as emergent in nature. There is no evidence to suggest that there was a threat of release of the contaminants beyond the Plainville Site or that any imminent danger to the public existed from the contaminated condition of the Plainville Site.

Finally, the facts alleged in this case indicate that the DEP intended OBG's remedial actions to effectuate a permanent remedy for the Plainville Site (notwithstanding the later-adopted regulations), as opposed to a short-term removal effort. Such a permanent or long-term solution to a contaminated property is properly characterized as a remedial, as opposed to removal, action. *See* 42 U.S.C. § 9601(24); *Schaefer*, 457 F.3d at 195. Thus, in *Kelley*, the activities considered by the court to be a single removal action occurred over approximately two years, *see* 17 F.3d at 838-39, and in *Sherwin-Williams*, the relevant activity occurred over a period of less than two years. *See* 125 F. Supp. 2d at 747-48. Here, by contrast, OBG anticipated that the Property remediation would last five years, *see* Second Am. Compl. [doc. # 43] ¶ 25, and in actuality, OBG conducted remediation work until 2004, a period of approximately fourteen years. Moreover, in *Kelley* and *Sherwin-Williams*, the purported removal actions occurred immediately prior to a permanent, remedial solution. *See* 17 F.3d at 839; 125 F. Supp. 2d at 747. Here, OBG cannot point to a permanent remedial solution that followed its removal actions because the actions it considers to be removal actions were, in fact, the permanent remedial solution envisioned under CERCLA.

For these reasons, the Court concludes that the holdings in *Kelley* and *Sherwin-Williams* are inapposite. Instead, the Court believes that *Schaefer* and the other cases from the Second Circuit

cited above are more relevant, and those decisions lead the Court to conclude that OBG's obligations under the Purchase Agreement constituted remedial actions pursuant to CERCLA, 42 U.S.C. § 9601(24). Because the Court concludes that OBG's activities were part of a remedial action, OBG's CERCLA claim is, as the parties agreed, foreclosed by the relevant statute of limitations. Therefore, the Court will grant both Northrop Grumman's and Best Friends' motions to dismiss as to Count IX.

## VI. CLAIMS AGAINST BEST FRIENDS

Finally, in Counts X and XI, OBG asserts common law claims of private nuisance and trespass against Best Friends. In each, OBG alleges that Best Friends failed to investigate and remediate pollution on its parcel and as a result of Best Friends' "malfeasance," pollution migrated from Best Friends' parcel onto OBG's Property. Second Am. Compl. [doc. # 43] ¶¶ 142-57.

### A. NUISANCE

To establish a private nuisance under Connecticut law (the law applicable to these claims), OBG must establish four elements: (1) "'the condition . . . had a natural tendency to create danger . . . (2) the danger created was a continuing one; (3) the use of the land was unreasonable or unlawful; and 4) the existence of the nuisance was the proximate cause of the plaintiff's injuries.'" *Burgess v. State*, 920 A.2d 383, 389-90 (Conn. Super. Ct. 2007) (quoting *Hammond v. Waterbury*, 219 Conn. 569, 579 (1991)). Claims of nuisance fall into two discrete categories: absolute nuisance and negligent nuisance. "The principal distinction between the two is that an absolute nuisance has the added requirement that the conduct be intentional. Intentional, in this context, means not that a wrong or the existence of a nuisance was intended, but that the creator of [it] intended to bring about the conditions which are in fact found to be a nuisance." *Green v. Ensign-Bickford Co.*, 25 Conn.

51

App. 479, 490 (1991) (alteration in original and internal citations and quotations and footnote omitted); *see also Monick v. Greenwich*, 144 Conn. 608, 611 (1957); *Beckwith v. Stratford*, 129 Conn. 506, 510-11 (1942); *Dingwell v. Litchfield*, 4 Conn. App. 621, 624 (1985).

As a preliminary matter, the Court agrees with Best Friends that OBG has failed to allege the elements of absolute nuisance. Nowhere in the Second Amended Complaint does OBG allege that Best Friends was aware of the pollution on its property or that it was migrating onto OBG's Property. Indeed, nowhere in the complaint does OBG allege that Best Friends acted intentionally in bringing about the conditions that are alleged to be a nuisance. That is not a mere oversight on OBG's part since Best Friends moved to dismiss the amended complaint on similar grounds and OBG filed the Second Amended Complaint in an effort to respond to Best Friends' arguments, consistent with the obligations of OBG and its counsel under Rule 11. In these circumstances, it is telling that there are no allegations that Best Friends was aware of the pollution and that it was migrating but nevertheless allowed the nuisance to continue.

OBG contends that it has adequately alleged the intentional element by pointing to language in the Complaint that states that "each owner took title to a parcel where known contaminants existed . . . ." Second Am. Compl. [doc. # 43] ¶ 148. But Best Friends responds by noting that OBG provides no evidence to suggest that Best Friends had any greater knowledge about the pollution beneath its own property than OBG, an environmental consultant that had conducted environmental tests on Best Friends' property. In fact, in support of its fraudulent concealment claim, OBG asserted that Northrop Grumman's fraud relating to the pollution below Best Friends' land was "self-concealing." In those circumstances and since OBG does not allege in its complaint that Best

Friends itself had conducted any testing, it is difficult for the Court to understand how Best Friends could have intentionally created a nuisance or allowed one to continue.[14]

While the Court has an obligation to construe the allegations of the complaint in the light most favorable to OBG, the Court will not construe the complaint to allege conduct that is easily alleged and that OBG has obviously and consciously decided it cannot in good faith allege. *See, e.g.*, *Dotson v. Griesa*, 398 F.3d 156, 159 (2d Cir. 2005) ("[W]here pleadings are legally defective, dismissal is warranted without regard to the factual merits of a plaintiff's underlying claim."); *United States ex rel. Hyde v. McGinnis*, 429 F.2d 864, 866 (2d Cir. 1970) ("Merely designating the claim as falling in a specific category will not save if it in fact the allegations do not satisfy the label applied."); *see also La Porte County Republican Cent. Comm. v. Bd. of Comm'rs of La Porte*, 43 F.3d 1126, 1128 (7th Cir. 1994) ("A complaint may not be dismissed under Fed.R.Civ.P. 12(b)(6) just because it omits factual allegations, but it may be dismissed when the plaintiffs make it clear that they do not plan to prove an essential element of their case."). Therefore, the Court will grant Best Friends' motion to dismiss OBG's absolute nuisance claim for failure to state a claim.

Best Friends also argues that OBG's nuisance claim – whether absolute or negligent – is barred by the applicable statute of limitations. As a preliminary matter, the Court must decide

---

[14] In the Court's view, even more problematic for the merits of OBG's nuisance claim is the candid concession made by OBG's counsel at oral argument and suggested in its complaint, *see* Second Am. Compl. [doc. # 43] ¶¶ 4, 40, that OBG's own Product Recovery System was responsible, in part or entirely, for the migration of pollution from Best Friends' property onto OBG's Property. In essence, as OBG's counsel explained during oral argument, the Product Recovery System included pumps located close to Best Friends' property that drew contaminants from Best Friends' property onto OBG's Property. If the migration of contaminants from Best Friends' property primarily resulted from OBG's own operations – that is, if OBG's own system was primarily responsible for drawing contaminants onto its Property – it is not plausible to believe that any action, or lack of action by Best Friends, was the proximate cause of OBG's injury. However, the Court need not, and therefore does not, base its decision to grant Best Friends' motion to dismiss on this ground.

whether OBG's nuisance claim is subject to the general three-year statute of limitation for tort claims, *see* Conn. Gen. Stat. § 52-577, or the two-year statute of limitations for claims seeking damages for exposure to hazardous substances, *see* Conn. Gen. Stat. § 52-577c(b). While no Connecticut court has expressly decided this precise issue, the Court concludes that the two-year statute of limitations of § 52-577c applies to OBG's nuisance claim against Best Friends.

Section 52-577c(b) provides as follows:

> *Notwithstanding the provisions of sections 52-577* and 52-577a, no action to recover damages for personal injury or property damage caused by exposure to a hazardous chemical substance or mixture or hazardous pollutant released into the environment shall be brought but within two years from the date when the injury or damage complained of is discovered or in the exercise of reasonable care should have been discovered.

Conn. Gen. Stat. § 52-577c(b) (emphasis added). The plain language of this provision makes it clear that it trumps the general three-year limitation period when the claim is for damages "caused by exposure to a . . . hazardous pollutant." Here, OBG is seeking to recover damages for "property damage," Second Am. Compl. [doc. # 43] ¶¶ 143, 145, and for "personal injury," Second Am. Compl. [doc. # 43] ¶¶ 144, 149, caused by exposure to a hazardous chemical substance or hazardous pollutant released into the environment, that is, the underlying premise of OBG's nuisance claim.[15]

---

[15] The alleged migration in this case falls within § 52-577c(a)'s definitions of "exposure" "hazardous chemical substance" or "hazardous pollutant" and "release." Section 52-577c(a) provides: "For the purposes of this section: (1) 'Environment' means any surface water, ground water, drinking water supply, land surface or subsurface strata or ambient air within the state or under the jurisdiction of the state; (2) 'exposure' means any contact, ingestion, inhalation or assimilation, including irradiation; (3) 'hazardous chemical substance or mixture' means petroleum, a petroleum product or any chemical substance or mixture for which there is a federal standard, including any law, requirement, tolerance, prohibition, action level or similar legal authority adopted by an agency pursuant to federal law, including any such standard or legal authority adopted by a state or local government pursuant to federal law, generally intended to prevent, reduce or mitigate the risk of a disease or class or type of diseases to an individual or individuals resulting from exposure to such chemical substance or mixture; (4) 'hazardous pollutant' means any designated, specified or referenced chemical considered to be a 'hazardous substance' under Section 101(14) of the

Therefore, OBG's claim falls within § 52-577c's two-year time bar.  *See Travelers Indem. Co. v. Rubin*, 209 Conn. 437, 441 (1998) ("[T]he three year limitation period of § 52-577 applies to all actions based on a tort unless there has been a specific statutory exclusion."); *70 Water St. Assocs., LLC*, 2005 WL 895764, at *5 (finding that § 52-577c includes actions for trespass premised on petroleum contamination); *Tolchin v. Shell Oil Co.*, No. X03CV970510328S, 2004 WL 1965848, at *3 (Conn. Super. Ct. July 30, 2004) (finding that § 52-577c includes actions for negligence or willful misconduct premised on exposure to hazardous chemical substances); *Goldblum v. Pittston Co.*, No. CV 920126252S, 16 Conn. L. Rptr. 512 (Conn. Super. Ct. Apr. 24, 1996) (finding that § 52-577c(b) governs claims on negligence or other theory premised on exposure to hazardous chemical substances).

Based upon the allegations of the Second Amended Complaint, the two-year statute of limitations has long since run.  For the alleged nuisance – migration of pollution from Best Friends' property – started and continued many years before 2004.  *See Calabrese v. McHugh*, 170 F. Supp. 2d 243, 260 (D. Conn. 2001) (in applying Connecticut law, the court noted that a plaintiff "cannot persuasively argue that his tort claims for remediation costs did not accrue because his first injury was dwarfed by the ultimate loss").  However, once again, OBG asserts two theories to toll the statute of limitations: (1) continuing course of conduct and (2) successive actions.

---

Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. § 9601 (14); (5) 'release' means any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping or disposing into the environment." Conn. Gen. Stat. § 52-577c(a).  The migration alleged by OBG qualifies as "any contact" so as to meet the definition of "exposure" and is synonymous with "leaching" in the context alleged in the complaint.  Further, for purposes of its state statutory claims brought under Conn. Gen. Stat. § 22a-452(a), OBG agreed that the substances at issue qualified as  a "hazardous chemical substance or mixture" or a "hazardous pollutant" within the meaning of the statute.  *See supra* 41-42.

In support of its continuing course of conduct argument, OBG relies on what it claims is its "special relationship" with Best Friends. In its complaint, OBG describes this alleged "special relationship" as follows:

> Best Friends and OBG share a special relationship in that their respective parcels were formerly owned by [Northrop Grumman] and each owner took title to a parcel where known contamination existed, and a duty existed as each party's knowledge of the condition of their property and to prevent any such contamination from migrating off-site into the environment or onto the other's property.

Second Am. Compl. [doc. # 43] ¶ 148. The Court has previously concluded that there was no special relationship between OBG and Northrop Grumman sufficient to trigger the continuing course of conduct doctrine. *See supra* at 26. With Best Friends, OBG is not even able to point to a contractual relationship between the parties. Instead, it seems, OBG attempts to create Best Friends' duty out of thin air based on the fact that the two property owners purchased their parcels (albeit at different times) from the same former owner, and each knowingly acquired a contaminated parcel from that common owner. On those facts, there is no basis in law for this Court to conclude that there was a special relationship between OBG and Best Friends. For the same reasons stated in the earlier discussion regarding Northrop Grumman, the Court concludes that OBG cannot avail itself of the continuing course of conduct doctrine. Therefore, that doctrine will not serve to toll the statute of limitations on OBG's nuisance claim. *See also Johnson v. Town of N. Branford*, 64 Conn. App. 643 (2001) (finding that the continuing course of conduct doctrine did not toll the statute of limitations for an alleged common-law nuisance claim).

Alternatively, OBG asserts that its nuisance claim is not barred by the statute of limitations because the nuisance created by Best Friends was temporary, not permanent. "A permanent nuisance has been said to be one which inflicts a permanent injury upon real estate . . . . A temporary nuisance

is one where there is but temporary interference with the use and enjoyment of property . . . ." *Filisko v. Bridgeport Hydraulic Co.*, 176 Conn. 33, 40 (1978). The significance of the distinction between a temporary and a permanent nuisance is that if a nuisance is temporary, "each injury causes a new cause of action to accrue, at least until the injury becomes permanent." *Blackburn v. Miller-Stephenson Chem. Co., Inc.*, No. CV 930314089, 1998 WL 661445, at *5 (Conn. Super. Ct. Sept. 11, 1998); *see also Platt Bros. & Co. v. City of Waterbury*, 67 A. 508, 510 (Conn. 1907) (discussing a nuisance claim and finding that "each day such unlawful act was repeated the plaintiff suffered a fresh invasion of his legal rights"), *cited favorably in City of Bridgeport v. Admiral Assocs., LLC*, No. CV98035277, 2001 WL 195028, at *6 (Conn. Super. Ct. Feb. 7, 2001).

Whether a nuisance is properly characterized as temporary or permanent is ordinarily a question of fact. *Filisko,* 176 Conn. at 40. However, here it does not matter whether the nuisance in question is viewed as temporary or permanent, because OBG's complaint alleges that since November 2004, the wells located on OBG's Property have recovered only a *de minimis* amount of free-floating product. Second Am. Compl. [doc. # 43] ¶¶ 47, 146. Moreover, at oral argument, OBG's counsel represented to the Court that the alleged nuisance ended sometime prior to November 2004. Since the alleged nuisance – whether temporary or permanent – ceased by November 2004, OBG's nuisance claim is barred by the two-year statute of limitations of Connecticut General Statutes § 52-577c(b).

Therefore, the Court grants Best Friends' motion to dismiss OBG's absolute and negligent nuisance claims, Count X.

## B.    TRESPASS

OBG's trespass claim is premised on the same facts as its nuisance claim and therefore faces similar hurdles. "The essential elements of a trespass are: (1) the plaintiff's ownership or possessory interest in the land; (2) an invasion by the defendant which affects the plaintiff's ownership or possessory interest; (3) that such invasion was 'done intentionally'; and (4) damages." *Borrelli v. Hills*, No. CV064006452, 2007 WL 1675777, at *2 (Conn. Super. Ct. May 24, 2007); *see also Avery v. Spicer*, 90 Conn. 576, 579 (1916) (stating elements for trespass claim).

For the reasons previously stated, the Court will dismiss OBG's trespass claim because it has failed to allege that Best Friends acted intentionally. In Connecticut, "the requisite intent to enter another's land may be established if the act in question is done 'with knowledge that it will to a substantial certainty result in the entry of the foreign matter.'" *Borrelli*, 2007 WL 1675777, at *2 (citing Restatement (Second) of Torts § 158 cmt. i (1965)). "In order to be liable for trespass, one must *intentionally* cause some substance or thing to enter upon another's land. *Jameson v. Newington*, No. CV-04-0832671, 2006 WL 574257, at *2 (Conn. Super. Ct. Feb. 27, 2006). "Moreover, the intention required to make the actor liable for trespass is an intention to enter upon the particular piece of land in question . . . . An intrusion on the land of another as a result of negligence is not a trespass." *Id.* (citations and quotation marks omitted). In *Borrelli*, the court found that the plaintiffs failed adequately to allege intent in a trespass claim, and thus granted a motion to dismiss, because, in part, they made no allegations "that the defendants knew with substantial certainty that the materials would enter the property." *Id.* at *3.

Here, as with the absolute nuisance claim, OBG has failed to allege that Best Friends knew with substantial certainty that any pollution on its property was migrating onto OBG's Property.

While OBG alleges in conclusory fashion that Best Friends "intentionally, or with reckless disregard," did not investigate or remediate contaminants on its property, Second Am. Compl. [doc. # 43] ¶ 153, that is a far cry from an allegation that Best Friends intentionally caused or allowed contaminants to migrate onto OBG's property. *See Mather v. Birken Mfg. Co.*, No. CV-96-0564862, 1998 WL 920267 (Conn. Super. Ct. Dec. 8, 1998) (striking trespass claim as legally insufficient where "the plaintiffs have alleged acts which show that the defendants knew of contaminants on its own land," because "there are no facts alleged which rise to the level of showing that the defendant knew, or was substantially certain, of the impact its alleged activity had, or would have, on the plaintiff's property" ); *see also Vaillancourt v. Southington*, No. X03-CV-010510816S, 2002 WL 1293053, at *7 (Conn. Super. Ct. May 7, 2002). Given OBG's concession that its own Product Recovery System drew the pollution from Best Friends' parcel onto OBG's Property (*see* Second Am. Compl. [doc. # 43] ¶¶ 4, 40, note 14 *supra*), it is not surprising that OBG has made no such allegation. Finally, and in any event, any trespass claim that might be viable would in any event be subject to the same statute of limitations analysis as set forth above regarding OBG's negligent nuisance claim. Therefore, any such trespass claim would be barred by the two-year statute of limitations of Connecticut General Statutes § 52-577c(b).

Therefore, the Court grants Best Friends' Motion to Dismiss OBG's trespass claim, Count XI.

## VII.

As this Court discussed in *Collier v. Aksys Ltd.*, No. 3:04CV1232(MRK), 2005 WL 1949868, at *18 (D. Conn. Aug. 15, 2005), it is "often appropriate for a district court, when granting a motion to dismiss . . . to give the plaintiff leave to file an amended complaint." *Van Buskirk v. N.Y. Times Co.*, 325 F.3d 87, 91 (2d Cir. 2003); *see Olsen v. Pratt & Whitney Aircraft*, 136 F.3d 273, 276 (2d

59

Cir. 1998) ("Plaintiffs whose complaints are dismissed pursuant to Rule 9(b) are typically given an opportunity to amend their complaint.").  "Although leave to replead is within the discretion of the district court, refusal to grant it without any justifying reason is an abuse of discretion." *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir.1991).  However, as discussed above, OBG's counsel has represented to the Court that OBG does not request further opportunities to amend its complaint.  *See Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 55 (2d Cir. 1995) ("One good reason to deny leave to amend is when such leave would be futile.").

Thus, the Court will not grant leave to amend but instead GRANT Best Friends' Motion to Dismiss [doc. # 50] and Northrop Grumman's Motion to Dismiss [doc. # 52].  Because the Court elected not to convert Northrop Grumman's Motion to Dismiss into a Motion for Summary Judgment, the Court DENIES WITHOUT PREJUDICE Northrop Grumman's Motion for Summary Judgment [doc. # 53].  **The Clerk is directed to dismiss all claims against all defendants and close this file.**

IT IS SO ORDERED.

/s/ _____Mark R. Kravitz_____
            United States District Judge


**Dated at New Haven, Connecticut: August 30, 2007**.